641 S.E.2d 725 (2007)
In the Matter of C.W. & J.W., Minor Children.
No. COA06-742.
Court of Appeals of North Carolina.
March 20, 2007.
*727 Regina Floyd-Davis, Wilmington, for petitioner-appellee.
Sophie W. Hosford, Wilmington, for respondent-appellant.
STROUD, Judge.
Respondent Michael W. appeals the trial court order terminating his parental rights to two minor boys, C.W. and J.W.C.W. was born on 8 April 1995 and J.W. was born on 15 April 1998. Respondent is the biological father of both children.

I. Background
Between May 2001 and July 2003, respondent was on probation for a conviction of taking indecent liberties with a child. On 27 July 2003, respondent's probation was revoked and he was re-incarcerated. At that time, C.W. and J.W. lived at the Masonic Home for Children (Masonic Home) in Oxford, N.C. The children had been voluntarily placed in the Masonic Home by their mother, Kelly W., who was financially unable to provide food and housing for them.
In August 2003, the Masonic Home notified the Pender County Department of Social Services (DSS) that it had lost contact with the children's mother. On 15 September 2003, the children were placed in the nonsecure custody of DSS and DSS chose the Masonic Home as a foster placement for the children.
On 31 October 2003, an adjudication hearing was held in District Court, Pender County, at which the children's mother stipulated that C.W. and J.W. are dependent children within the meaning of N.C. Gen.Stat. § 7B-101(9). A dependent child is a child who is "in need of assistance or placement because the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or whose parent, guardian, or custodian is unable to provide for the care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen.Stat. § 7B-101(9) (2005). DSS recommended that the primary plan should be to reunify the children with their mother. On 30 January 2004, the trial court entered orders of adjudication in which the court found the same.
Although the children's mother entered into a case plan with DSS on 30 September 2003, she did not complete the plan, and on 23 July 2004 DSS requested that the trial court change the primary plan from reunification to adoption. Thereafter, the children's mother voluntarily relinquished her parental rights to both boys.
There is no evidence that DSS contacted respondent before seeking to cease reunification efforts with the children's mother and no evidence that DSS entered into a case plan with respondent. Respondent requested appointed counsel and also requested to be present at the subsequent permanency planning hearing, which was held on 31 March 2005. Following the hearing, the trial court ordered that the permanent plan for C.W. and J.W. would be adoption. In a later permanency planning report to the court dated 22 July 2005, DSS stated that respondent "has been very vocal about the agency intervention. He states [that] he should have rights to his children."
The history provided above is documented in previously filed DSS reports and court orders in this case. The trial court took judicial notice of these previously filed reports and orders in the order terminating respondent's parental rights.

II. Termination Hearing
On 28 July 2005, DSS filed a petition to terminate respondent's parental rights. Respondent did not answer the petition but did file a pro se motion to dismiss, which was subsequently denied. The trial court held a termination hearing on 16 December 2005, at which respondent was present and represented by counsel.
DSS presented evidence during the termination hearing to show that C.W. has been living at the Masonic Home since 2000 and that J.W. has been living there since 2001. When C.W. and J.W. were voluntarily placed in the Masonic Home, they were five years old and three years old respectively. Both children were placed in the Masonic Home by their mother without prior consultation with respondent, who learned of each child's placement after the fact.
*728 In 1998, respondent served a seventy-five day sentence for DWI. During this time, both children were removed from their parents' home by DSS in response to a report that C.W. had a suspicious bruise. The children were returned to their parents' home by DSS two and one half months later. DSS did not present any evidence to show that the 1998 removal resulted in an adjudication of abuse, neglect, or dependency, and the record is silent on this point.
Respondent was also incarcerated from June 2000 to May 2001 following a conviction for taking indecent liberties with his niece, who was a minor. He was released on probation in May 2001.
Respondent testified during the termination hearing that the superior court order setting the terms of his probation prevented him from having contact with C.W. and J.W. until he completed a mental evaluation. There is some evidence from the children's mother, in the form of a notation on J.W.'s psychological evaluation, that respondent would have been permitted to visit the children with the supervision of his pastor. The record does not show whether respondent ever completed the necessary mental evaluation; however, respondent did not visit the children at the Masonic Home or make other housing arrangements for the children while free on probation. Although C.W. and J.W. lived at the Masonic Home during this time, their placement in the home was a voluntary decision made by their mother and DSS did not have legal or physical custody of the children.
Respondent's probation was revoked on 27 July 2003 and he was re-incarcerated. DSS was awarded nonsecure custody of C.W. and J.W. shortly thereafter. During his incarceration, respondent sent or arranged for the sending of birthday and Christmas cards to the children. Typically, each card contained $5.00. Respondent also requested that his parents, who live in Iowa, be considered as a relative placement for the children. After contacting respondent's parents, DSS concluded that they were not a suitable placement. Respondent testified at the termination hearing that his parents were financially unable to care for C.W. and J.W. At the time of the termination hearing, respondent's projected release date from prison was in May 2006.
Following the hearing, the trial court entered an order terminating respondent's parental rights. In its order, the trial court found three grounds for termination: (1) respondent neglected C.W. and J.W., (2) respondent willfully left C.W. and J.W. in foster care for more than twelve months without making reasonable progress under the circumstances toward correcting the conditions that led to their removal from the home, and (3) respondent willfully abandoned C.W. and J.W. These grounds are set forth by statute in N.C. Gen.Stat. § 7B-1111(a)(1), (2) and (7) (2005) respectively. In addition, the trial court concluded that termination of respondent's parental rights is in the children's best interests pursuant to N.C. Gen.Stat. § 7B-1110 (2005). The termination order was entered on 17 February 2006, sixty days after the termination hearing.
For the reasons stated below, we hold that DSS failed to present sufficient evidence of any statutory ground for termination alleged in its petition. Accordingly, we reverse the trial court order terminating respondent's parental rights.

III. Standard of Review
N.C. Gen.Stat. § 7B-1111 lists nine grounds for which a trial court may terminate a party's parental rights. N.C. Gen. Stat. § 7B-1111. DSS, or any other party identified in N.C. Gen.Stat. § 7B-1103 (2005), may initiate a proceeding to terminate parental rights by filing a petition in district court. N.C. Gen.Stat. § 7B-1103. The petition must allege "[f]acts that are sufficient to warrant a determination that one or more of the grounds for terminating parental rights [listed in N.C. Gen.Stat. § 7B-1111] exist." N.C. Gen.Stat. § 7B-1104(6) (2005). A termination proceeding is conducted in two stages: adjudication and disposition. N.C. Gen.Stat. §§ 7B-1109, 1110 (2005). The petitioner carries the burden of proof during adjudication, In re Mitchell, 148 N.C.App. 483, 488, 559 S.E.2d 237, 241 (2002), but there is no burden of proof on either party during disposition, In re Dexter, 147 *729 N.C.App. 110, 114, 553 S.E.2d 922, 924 (2001).
During adjudication, the trial court must determine whether the petitioner has presented clear, cogent, and convincing evidence of the existence of one or more of the grounds for termination set forth in N.C. Gen.Stat. § 7B-1111. If the court finds at least one ground to exist, then the proceeding continues to disposition phase. See In re Carr, 116 N.C.App. 403, 407, 448 S.E.2d 299, 302 (1994) (holding that "the court exercises its discretion in the dispositional stage only after the court has found that there is clear and convincing evidence of one of the statutory grounds for terminating parental rights during the adjudicatory stage"). During disposition, the trial court must determine whether terminating the respondent's parental rights is in the child's best interests. N.C. Gen.Stat. § 7B-1110. The court's decision regarding the best interests of the child represents an exercise of the court's discretion. In re Montgomery, 311 N.C. 101, 316 S.E.2d 246 (1984).
On appeal, this Court considers whether the trial court's findings of fact are based on clear, cogent, and convincing evidence and whether those findings support the trial court's conclusion that grounds for termination exist pursuant to N.C. Gen.Stat. § 7B-1111. In re Oghenekevebe, 123 N.C.App. 434, 436, 473 S.E.2d 393, 395 (1996). This standard of review directly corresponds to the adjudication phase of the termination proceeding. This Court also considers whether the trial court abused its discretion in determining that it was in the child's best interests to terminate the respondent's parental rights. In re Anderson, 151 N.C.App. 94, 98, 564 S.E.2d 599, 602 (2002). This standard of review directly corresponds to the disposition phase of the termination proceeding.

IV. Neglect
Respondent assigns error to the trial court's conclusion that he neglected C.W. and J.W. We agree that DSS did not present clear, cogent, and convincing evidence that this ground for termination exists.
N.C. Gen.Stat. § 7B-1111(a)(1) provides that the trial court may terminate a party's parental rights upon a finding that "[t]he parent has abused or neglected the juvenile." For purposes of N.C. Gen.Stat. § 7B-1111(a)(1), a neglected child is a child
who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.
N.C. Gen.Stat. § 7B-101(15) (2005). To establish neglect as a ground for termination of parental rights, the petitioner must present clear, cogent, and convincing evidence that (1) the child is neglected as described in N.C. Gen.Stat. § 7B-101(15) above, and (2) the child "has sustained some physical, mental, or emotional impairment . . . or there is substantial risk of such impairment as a consequence of the neglect." In re Beasley, 147 N.C.App. 399, 403, 555 S.E.2d 643, 646 (2001) (internal citation and quotation omitted). Neglect must exist at the time of the termination hearing, or if the parent has been separated from the child for an extended period of time, the petitioner must show that the parent has neglected the child in the past and that the parent is likely to neglect the child in the future. In re Ballard, 311 N.C. 708, 714-15, 319 S.E.2d 227, 231-32 (1984) ("We hold that evidence of neglect by a parent prior to losing custody of a child including an adjudication of such neglectis admissible in subsequent proceedings to terminate parental rights" but "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect.").
*730 A parent's incarceration may be relevant to whether his child is neglected; however, "`[i]ncarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision.'" In re P.L.P., 173 N.C.App. 1, 10, 618 S.E.2d 241, 247 (2005) (quoting In re Yocum, 158 N.C.App. 198, 207-08, 580 S.E.2d 399, 405 (2003) (Tyson, J. dissenting)), aff'd per curiam, 360 N.C. 360, 625 S.E.2d 779 (2006). For example, in In re P.L.P., this Court affirmed a trial court order terminating parental rights based on neglect when the trial court found that the incarcerated respondent "(1) `could have written' but did not do so; (2) `made no efforts to provide anything for the minor child'; (3) `has not provided any love, nurtur[ing] or support for the minor child'; and (4) `would continue to neglect the minor child if the child was placed in his care[.]'" 173 N.C.App. at 10-11, 618 S.E.2d at 247 (alteration in original). In In re P.L.P., the trial court had also entered two previous adjudication orders in which the court concluded that P.L.P. was neglected. Id. at 3-4, 618 S.E.2d at 243.
Similarly, in In re Bradshaw, this Court affirmed a trial court order terminating parental rights based on neglect when the court found that the incarcerated respondent "neither provided support for the minor child nor sought any personal contact with or attempted to convey love and affection for the minor child." 160 N.C.App. 677, 682, 587 S.E.2d 83, 86 (2003). In both In re P.L.P. and In re Bradshaw, this Court determined that the trial court's findings of fact were supported by clear, cogent, and convincing evidence, and that these findings were sufficient to support the trial court's conclusion that neglect existed as a ground for termination pursuant to N.C. Gen.Stat. § 7B-1111(a)(1). In re P.L.P., 173 N.C.App. at 13, 618 S.E.2d at 248; In re Bradshaw, 160 N.C.App. at 682, 587 S.E.2d at 87.
However, in In re Shermer, 156 N.C.App. 281, 288, 576 S.E.2d 403, 408 (2003), this Court reversed an order terminating a father's parental rights based on neglect despite the trial court's finding that the father "had failed to complete various parts of his case plan" by failing to "maintain employment," failing to "contact[ ] the social worker once per week," failing to "participat[e] in therapy sessions" with his children, failing to "pay child support or establish a support obligation for the children," failing to "attend[ ] parenting classes," and failing to complete "a drug and alcohol assessment." This Court concluded that the trial court's finding was not supported by "clear, cogent, and convincing evidence of neglect or evidence that neglect could reoccur" because DSS had entered into the case plan with the father, who was recently released from prison, less than two months before the termination hearing. In re Shermer, 156 N.C.App. at 288, 576 S.E.2d at 408.
In re P.L.P, In re Bradshaw, and In re Shermer guide our analysis in the case sub judice. Here, there is no previous adjudication of neglect; rather, C.W. and J.W. were voluntarily placed in the Masonic Home by their mother to ensure that they would receive proper care, supervision, and discipline. The children came into DSS custody in September 2003 after the Masonic Home lost contact with their mother. Thereafter, the mother stipulated that C.W. and J.W. are dependent, meaning that neither she nor respondent, who was incarcerated, were able to care for the children and that they lacked suitable alternative child care. Although DSS entered into a case plan with the children's mother, DSS has never entered into a case plan with respondent.
The evidence presented by DSS shows that while C.W. and J.W. have been in DSS custody, respondent has written letters to the children and sent them birthday and Christmas cards, including some money. In its permanency planning report to the court dated 22 July 2005, DSS stated that respondent "has been very consistent with writing his children. He has not forgotten a birthday nor Christmas." On direct examination during the termination hearing, the children's social worker testified that respondent "writes the children" and that "on Christmas they each get a cardon Christmas and their birthdays and I think $5.00 is in each card each time." The social worker also testified that she had personally seen the cards and money.
*731 An affidavit filed by respondent's family members alleges that DSS prevented respondent's letters from reaching the children, stating:
Since [respondent] has been incarcerated he has always tried to stay in contact with his children. He has always asked us to send them birthday and holiday cards from him. He has written letters telling them he loves and thinks about them all the time. He has never received a reply. DSS informed us all correspondence from [respondent] was thrown away, but ours was given to the boys.
On cross-examination, respondent testified that he tried to find out why the children were not receiving his letters.
I wrote constantly. It never surprised me that I never did get a response because of the situation that they were in. I found out at one point that my letters weren't even getting to them. So I wrote to Masonic Home about that to see why. They said DSS told them that the children were not to get my letters. That lasted up until the filing of this petition. But through the whole time I wrote them anyway just hoping that somehow or another the letters would get through.
Although the social worker explained that respondent's "correspondence had to be monitored by [the children's] therapist" and that the children "could not receive the mail and read it themselves," DSS did not present any evidence that respondent's letters were disturbing to the children or were otherwise inappropriate. It appears from the record that correspondence was respondent's only means of contact with the children while they were in DSS custody, as the social worker testified that DSS policy does not permit visitation with an incarcerated parent.
Between May 2001 and July 2003 respondent was on probation; however, respondent testified that the terms of his probation prohibited him from having contact with the children until he received a mental evaluation. During this time, the children resided in the Masonic Home, but were not in DSS custody. There is some evidence from the children's mother, in the form of a notation on J.W.'s psychological evaluation, that respondent would have been permitted to visit the children in the Masonic Home with the supervision of his pastor. Respondent's actual probation order is not in the record on appeal and there is no further evidence on this point.
Between June 2000 and May 2001, respondent was incarcerated. Respondent testified that, up until this incarceration, he cared for the children and enjoyed spending time with them. In particular, respondent testified that he worked at a factory in Burgaw and that he provided a home for the family. With respect to C.W., respondent testified "[f]rom the time that [he] was born until the very last night I saw him, I was with that boy every day of my life," adding, "I took that boy wherever I was going."
Based on the evidence, the trial court made the following relevant findings of fact:
7. That [respondent] was aware at all times of the placement of C.W. and J.W. at the Masonic Home for Children in Oxford. They remained in said placement from the time he was paroled in 2001, throughout the period of his release and since his re-incarceration. The record is void of any interaction between [respondent] and his sons via letters, telephone or visits during their placement at the Masonic Home.
8. That the Psychological Evaluation completed on [the children's mother] reveals a lack of stability amongst (sic) the family during the period of time [respondent] resided with [the children's mother] and the juveniles. In 1999, respondent "lost his employment following `dirty' testing on a random drug screen and initiated further deterioration of their household." [The children's mother] further described respondent as "an angry alcoholic who was in and out of jail for drunkenness and, finally, for a child molestation conviction." In 2001, reunification of [the children's mother] and respondent led to the "continued dysfunction in the relationship which would foster other separations." During said period, respondent failed to fulfill his probationary obligations of obtaining counseling and "he remained on the run for a *732 period of weeks before being caught in July 2003."
. . . .
13. That [respondent] has been present at review hearings regarding the Juveniles, and has always been represented by counsel. Paternal relatives requested for consideration of placement by the [r]espondent were contacted; no relative indicated a willingness or ability to provide a permanent home for C.W. and J.W. The [r]espondent made no other requests for consideration of non-relatives.
14. The [r]espondent has not legitimated the Juveniles pursuant to N.C.S. Section 49-10 or by marriage to the mother of the Juveniles. He has never provided substantial financial support or consistent care with respect to the Juveniles and their mother.
15. That the Court takes judicial notice of all of the Orders and court reports as set forth in the Pender County Juveniles proceeding hearing . . . titled "In the Matter of [C.W.] and [J.W.]."
We conclude that significant portions of these findings of fact are wholly unsupported by the evidence presented during the termination proceeding.
In particular, there is no evidence to support the trial court's finding that "[t]he record is void of any interaction between [respondent] and his sons via letters, telephone or visits during their placement at the Masonic Home" or that respondent "has not legitimated the Juveniles pursuant to N.C.S. Section 49-10 or by marriage to the mother of the Juveniles." To the contrary, undisputed evidence shows respondent was very consistent in writing the children and DSS concedes in its brief that, although C.W. was born out of wedlock, respondent married the children's mother shortly thereafter.[1] J.W. was born during the marriage. It is also undisputed that the children's mother did not tell respondent she was placing C.W. and J.W. in the Masonic Home until after she had already done so; thus, the trial court's finding that respondent "was aware at all times of the placement of C.W. and J.W. at the Masonic Home for Children at Oxford" is likewise unsupported by the evidence.
Additionally, there is no evidence to support finding of fact number eight, which is a compilation of quoted statements apparently made by the children's mother during a psychological evaluation. DSS did not introduce the psychological evaluation into evidence and did not call the children's mother as a witness. Moreover, the psychological evaluation is not contained in the record on appeal, and we find no mention of the document anywhere except in the trial court order.[2]
*733 The trial court's remaining findings of fact are insufficient to support its conclusion that respondent neglected C.W. and J.W. Accordingly, we hold that the trial court erred by terminating respondent's parental rights on the ground of neglect.

IV. Failure to Make Reasonable Progress
Respondent assigns error to the trial court's conclusion that he willfully left C.W. and J.W. in foster care for more than twelve months without making reasonable progress under the circumstances toward correcting the conditions that led to their removal from the home. We agree that DSS did not present clear, cogent, and convincing evidence that this ground for termination exists.
N.C. Gen.Stat. § 7B-1111(a)(2) provides that the trial court may terminate a party's parental rights upon a finding that
[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. Provided, however, that no parental rights shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.
(Emphasis added.) Leaving a child in foster care is willful when a parent has "the ability to show reasonable progress, but [is] unwilling to make the effort." In re Fletcher, 148 N.C.App. 228, 235, 558 S.E.2d 498, 502 (2002). The relevant time period for measuring "reasonable progress under the circumstances" begins after "removal of the juvenile" from the home. N.C. Gen.Stat. § 7B-1111(a)(2). A parent's incarceration is a "circumstance" that the trial court must consider in determining whether the parent has made "reasonable progress" toward "correcting those conditions which led to the removal of the juvenile." See In re Shermer, 156 N.C.App. at 290, 576 S.E.2d at 409 (noting that "[b]ecause [the] respondent [father] was incarcerated, there was little involvement he could have beyond what he didwrite letters to [his sons] and inform DSS that he did not want his rights terminated"). For purposes of Chapter 7B, we understand "removal" to mean taken into temporary custody pursuant to N.C. Gen.Stat. § 7B-500 (2005) or nonsecure custody pursuant to N.C. Gen.Stat. § 7B-502 (2005).
In In re Shermer, this Court held that a trial court's findings of fact were insufficient to support termination of a father's parental rights on this ground. 156 N.C.App. at 281, 576 S.E.2d at 403. In so doing, the Court applied a previous enactment of N.C. Gen.Stat. § 7B-1111(a)(2), which provided that the relevant time period for measuring "reasonable progress" was the twelve months immediately preceding the filing of a petition for termination of parental rights. Id.; see also In re Pierce, 356 N.C. 68, 75, 565 S.E.2d 81, 86 (2002). The Court emphasized that (1) the trial court "made no findings at all" as to the father's progress, or lack there of, during the relevant twelve-month period before the termination proceeding was filed; (2) the father had been incarcerated during those twelve months; and (3) the father had no involvement in the events which led to the child's removal from the home. 156 N.C.App. at 289-90, 576 S.E.2d at 409. We conclude that In re Shermer is analogous to the case sub judice.
Here, the trial court found:
12. That the [r]espondent . . ., has willfully left [C.W. and J.W.] in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the Court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the Juveniles. During the period of time that [respondent] was not incarcerated, he took no action to reunite with his children and provide a stable living environment for the family. The children remained in the Masonic Home for Children prior to his re-incarceration for probation violation. As part of his probation violation Order, [r]espondent-father was ordered not to have contact with his children and may have contributed to his revocation by attempting contact.
*734 The trial court failed to make any findings of fact specifically related to respondent's progress after C.W. and J.W. were removed. In fact, DSS never entered into a case plan against which the trial court could measure respondent's progress.[3]
It is undisputed that respondent was incarcerated during the entire period of removal preceding the filing of the petition, from 27 July 2003 to 28 July 2005. It is also undisputed that respondent regularly wrote to C.W. and J.W. from prison, and when respondent learned that his letters were not reaching the children, respondent attempted to remedy the problem. During this time respondent was "very vocal" in informing DSS that he desired "rights to his children."
Moreover, there is no evidence to support the trial court's finding that respondent was ordered not to have contact with C.W. and J.W. pursuant to a "Probation Violation Order." All the evidence presented during the termination hearing showed that the restriction on contact was an original term of respondent's probation. Likewise, DSS presented no evidence to support the trial court finding that respondent "may have contributed to his revocation by attempting contact."
For these reasons we hold that the trial court's findings of fact are insufficient to support its conclusion that respondent willfully left C.W. and J.W. in foster care for more than twelve months without making reasonable progress under the circumstances toward correcting the conditions that led to their removal from the home. In so doing, we also incorporate our earlier determination that significant portions of the trial court's findings of fact numbered seven, eight, thirteen, fourteen, and fifteen are unsupported by clear, cogent, and convincing evidence. The trial court erred in terminating respondent's parental rights on this ground.

VI. Abandonment
Respondent assigns error to the trial court's conclusion that he abandoned C.W. and J.W. In support of this assignment, respondent emphasizes that DSS did not allege abandonment as a ground for termination in its petition. We agree that the trial court erred in terminating respondent's parental rights on this ground.
A petition for termination of parental rights must allege "[f]acts that are sufficient to warrant a determination that one or more of the grounds for terminating parental rights [listed in N.C. Gen.Stat. § 7B-1111] exist." N.C. Gen.Stat. § 7B-1104. N.C. Gen.Stat. § 7B-1111(a)(7) provides that the trial court may terminate a party's parental rights upon a finding that
[t]he parent has willfully abandoned the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion, or the parent has voluntarily abandoned an infant pursuant to G.S. § 7B-500 for at least 60 consecutive days immediately preceding the filing of the petition or motion.
"Abandonment implies conduct on the part of the parent which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child." In re Searle, 82 N.C.App. 273, 275, 346 S.E.2d 511, 514 (1986).
Here, DSS alleged only three grounds for termination of respondent's parental rights in its petition: (1) neglect, (2) willfully leaving C.W. and J.W. in foster care without making reasonable progress to correct the conditions that led to their removal from the home, and (3) failing to pay child support for a continuous period of six months preceding the filing of the petition.[4] DSS concedes in its brief "that the Petition to Terminate Respondent-Appellant's *735 Parental Rights did not contain an allegation of Abandonment." Even so, DSS urges this Court to affirm the trial court's termination of respondent's parental rights based on abandonment, arguing that "the evidence presented [during the termination hearing] does support such a finding."
"While there is no requirement that the factual allegations in a petition for termination of parental rights be exhaustive or extensive, they must put a party on notice as to what acts, omissions, or conditions are at issue." In re Hardesty, 150 N.C.App. 380, 384, 563 S.E.2d 79, 82 (2002). Because it is undisputed that DSS did not allege abandonment as a ground for termination of parental rights, respondent had no notice that abandonment would be at issue during the termination hearing. Accordingly, the trial court erred by terminating respondent's parental rights based on this ground.

VII. Conclusion
For the reasons stated above, we hold that DSS failed to present clear, cogent, and convincing evidence of any statutory ground alleged in its petition for termination of respondent's parental rights. Although respondent raises several additional issues on appeal, including the questions of whether the trial court abused its discretion in concluding that termination of his parental rights was in the children's best interests and whether the trial court erred by entering the termination order more than thirty days after the termination hearing, we do not reach these assignment of error. Our holdings on the above grounds are dispositive and it is unnecessary to reach respondent's assignments of error on these issues. Accordingly, we reverse the trial court order terminating respondent's parental rights.
REVERSED.
Judges TYSON and STEPHENS concur.
NOTES
[1] When the mother and father of a child born out of wedlock marry, North Carolina law considers that child to be a legitimate child of the marriage. N.C. Gen.Stat. § 49-12 (2005).
[2] We find it curious that the trial court order contains information that was neither introduced nor admitted at trial. We note, however, that the DSS attorney prepared this order at the trial court's request and that the order was not entered until sixty days after the termination hearing. See N.C. Gen.Stat. § 7B-1110(a) ("Any order [terminating parental rights] shall be reduced to writing, signed, and entered no later than 30 days following the completion of the termination of parental rights hearing."); N.C. Gen.Stat. § 7B-1109(e) ("The adjudicatory order [finding grounds for termination of parental rights] shall be reduced to writing, signed, and entered no later than 30 days following completion of the hearing."). We further note that following the termination hearing, the trial court issued an oral ruling terminating respondent's parental rights on a single ground: neglect. Nevertheless, the actual order prepared by the DSS attorney and entered by the trial court terminated respondent's parental rights on three grounds, including one ground that was never pled by DSS in its petition.

Notwithstanding these troubling circumstances, "verbatim recitations of the testimony of each witness" or, as in the case sub judice, verbatim quotation from the prior statements of a witness, "do not constitute findings of fact by the trial judge, because they do not reflect a conscious choice between the conflicting versions of the incident in question which emerged from all the evidence presented." In re Green, 67 N.C.App. 501, 505 n. 1, 313 S.E.2d 193, 195 n. 1 (1984) (emphasis in original). Because finding of fact number eight consists primarily of quoted statements purportedly made by the children's mother, it is not a true finding for purposes of N.C. Gen.Stat. § 7B-1109(e) or N.C. Gen.Stat. § 1A-1, Rule 52 (2005). Thus, even if DSS had entered the report into evidence and the report contained the quoted statements, the trial court finding reciting those statements verbatim is legally insufficient to support any conclusion of law.
[3] We do not imply that DSS must enter into a case plan with every parent before seeking termination of parental rights pursuant to N.C. Gen.Stat. § 7B-1111; rather, when DSS seeks to terminate a parent's parental rights on the ground set forth in section 7B-1111(a)(2), a case plan is helpful to both the parties and the trial court in determining whether the parent has made "reasonable progress under the circumstances." This is especially true where, as here, the respondent testifies that he is willing to do anything DSS requests to regain custody of his children, including undergoing treatment programs, counseling, weekly substance abuse urine screens, etc.
[4] At the termination hearing, DSS elected not to proceed on the ground that respondent failed to pay child support.