DAVIS, Judge.
J.P. ("Respondent-mother") and A.P. ("Respondent-father") (collectively "Respondents") appeal from the trial court's 27 October 2014 order terminating their parental rights as to A.P., Jr. ("Andre")[1] , C.P. ("Chantel"), J.P. ("Jared"), N.P. ("Nehemiah"), and J.P. ("Janice") (collectively "the children").[2] After careful review, we affirm.
Factual Background
Respondents were married from 11 June 2005 to 30 December 2010. Respondent-father legitimated Andre, whose birth preceded the marriage, and is the legal father of the remaining four children as he was married to Respondent-mother during each of their births. Genetic testing, however, has established that D.B. and J.G. are the biological fathers of Chantel and Janice, respectively.
On 3 May 2013, the Durham County Department of Social Services ("DSS") filed a juvenile petition alleging that all five children were neglected juveniles. The petition also alleged that Andre was an abused juvenile and that Chantel and Janice ("the girls") were dependent juveniles based on the fact that while Andre, Jared, and Nehemiah ("the boys") had been voluntarily placed with their paternal grandmother ("Ms.B") by Respondents, the girls did not have an alternative appropriate placement option. The petition stated that Respondent-mother (1) had inflicted serious physical injury upon Andre through inappropriate discipline; (2) failed to protect the children from sexual abuse by her uncle, a cousin, and J .G.; (3) did not timely report the abuse or seek treatment for the children; (4) failed to obtain medical appointments for them; and (5) failed to ensure Andre's and Chantal's regular school attendance. The petition also cited "a history of domestic violence between [Respondent-mother] and [Respondent-father] and [J.G.] ... in the presence of the children," a history of substance abuse by each parent, and a history of mental health issues impairing Respondent-mother's ability to care for her children.
The trial court initially granted temporary legal custody of the boys to Ms. B. and nonsecure custody of the girls to DSS. However, Ms. B. notified DSS on 14 May 2013 that she was unable to care for the boys but would be willing to keep Andre in her custody if she was provided assistance. DSS filed a supplemental petition alleging that Jared and Nehemiah were dependent juveniles and seeking nonsecure custody of all three boys. Jared and Nehemiah were placed in foster care on 14 May 2013. In July of 2013, DSS obtained nonsecure custody of Andre and placed him in foster care due to Ms. B.'s inappropriate contacts with the other children's foster parents.
On 15 July 2013, the trial court entered an order adjudicating all five children neglected and dependent juveniles. The trial court also determined that Andre was an abused juvenile. Included in the order were findings that Ms. B. "has repeatedly contacted the current foster placements for [Jared and Nehemiah] and jeopardized their current placement by being disruptive with the foster parent" and that her "inability to care for the children without significant assistance and inappropriate behaviors towards the caregivers of the other children" made her unfit as a placement option "for any of the children." The trial court continued custody of the children with DSS and authorized their placement in foster care.
Prior to the initial 90-day review hearing, seeN.C. Gen.Stat. § 7B-906(a) (repealed effective Oct. 1, 2013),[3] Respondent-father moved the trial court to return Andre to Ms. B.'s custody, noting that she had apologized to Jared's and Nehemiah's foster mother. Ms. B. also moved to intervene in the case. Respondent-mother filed a motion asking the court to grant custody of the children to their maternal great-grandmother ("Ms. J.P.").
In its 90-day review order entered 30 September 2013, the trial court noted that Respondent-mother was "no longer recommending" that the children be placed with Ms. J.P. after a DSS home study found such placement inappropriate.[4] The trial court further found that Andre's foster parent had discovered him "in bed with a 10 year old child playing out a love scene [,]" and that Jared's and Nehemiah's foster parent had observed "inappropriate sexual behaviors" between the two brothers. Regarding Ms. B.'s potential as a placement option, the trial court found as follows:
13. Ms. [B.] ... has expressed an interest in providing placement for all three boys at her home.... Neither Durham DSS nor the [Guardian ad Litem] are [sic] recommending her home as a placement for the children.
14. All three boys have special needs due to being exposed to sexual abuse and need to be kept separate and monitored....
15. Ms. [B.] reports that she has hired a nanny ..., but this nanny has no special training in dealing with special needs children and Ms. [B.] has not informed the nanny of the issues the children are facing. Ms. [B.] has exhibited a lack of belief in the boys sexually acting out.
16. Ms. [B.] has acted inappropriately in her communications with the children's foster parents and Durham DSS. Ms. [B.]'s communications with Durham DSS raised concerns with Durham DSS about [her] mental health.
17. Ms. [B.] also engaged in inappropriate conversations with [Andre] by promising him that he would return to her home by or after this court hearing.
18. Ms. [B.] obtained a psychological evaluation without input from Durham DSS. The psychologist ... found that her reports of experiencing no depressive symptoms were inconsistent with her presentation and advised that her psychometric testing should be interpreted with caution. Ms. [B.] has been previously hospitalized for anxiety.....
19. Ms. [B.]'s home, while physically able to accommodate the children, is not an appropriate placement for the children. The children need an environment to heal and need to receive therapy.
Based on these findings, the trial court expressly concluded that "[p]lacement in the home of [Ms. B.] is not in the best interests of the children." By separate order, the court also denied Ms. B.'s motion to intervene.
The trial court appointed a guardian ad litemto represent Respondent-mother, finding that she had been "diagnosed with schizoaffective disorder and ... is delusional[,] ... is detached from reality and its consequences[,] ... has experienced probable hallucinations and has acted in response to those hallucinations[, and] ... is unable to manage her own affairs with regard to this case[.]" Ms. J.P. filed a motion to intervene in the cause, expressing "her desire to have all the children live in her home under one roof" and stating that she was "capable and willing of providing the daily care and needs of her five great grandchildren." The trial court denied the motion on 10 March 2014.
Following a permanency planning hearing on 29 May 2014, the trial court directed DSS to continue reasonable efforts toward reunification but established a permanent plan for the children of adoption with an alternative plan of guardianship by order entered 27 June 2014. The court found that Respondent-mother had been involuntarily committed on 29 December 2013 after she saw demons in her house and "intentionally burned the house down[.]" During her commitment, she tested positive for marijuana and "requested to go to jail as she was seeing ghosts in the home." Respondent-mother was charged with two counts of second-degree arson and jailed from 31 December 2013 to 29 April 2014. She refused mental health treatment while in jail and moved into Ms. J.P.'s residence following her release on bond. The court ordered that Respondent-mother's visitation with the children "be suspended until she is successfully engaged in mental health treatment as recommended by her psychological evaluation."
In its permanency planning order, the trial court again concluded that placement of the children in the home of Ms. B. or Ms. J.P. was "not in the best interests of the children." Although Ms. B. had reported contacting a mental health service provider for the children, the court noted that she discontinued her own therapy after "decid[ing] it was no longer useful." The court expressed concerns about an aborted attempt by Ms. B. and her husband to become licensed as therapeutic foster parents. When an issue had been raised about her husband's criminal history, the trial court found that he and Ms. B. failed to follow through by providing staff with "the information needed in order to complete the process[.]"
Regarding a placement with Ms. J.P., the court emphasized her "lack of belief that the children had been sexually abused by her son ..., who lived in the home with [Ms. J.P.] until just prior to the [DSS] home study in the Fall of 2013." Testifying at the permanency planning hearing, Ms. J.P. "continued to demonstrate a lack of belief that the children were sexually abused by her son." The court found that Ms. J.P.'s "failure to acknowledge the potential danger of sexual abuse and her failure to accept that sexual abuse occurred prevents her home from being the therapeutic environment ... that is needed by the children."
DSS filed a petition to terminate Respondents' parental rights to the children on 1 July 2014. The court held a termination of parental rights hearing on 25 and 26 September 2014. Respondent-father did not attend the hearing. Respondent-mother was transported from jail to the courthouse so that she could participate. After meeting privately with her counsel and her guardian ad litem,however, "[s]he insisted on being returned to the jail, before the hearing commenced." The trial court heard the parties' evidence and entered an order on 27 October 2014, determining that multiple grounds existed to terminate Respondents' parental rights and concluding that termination was in the children's best interests. Respondents filed timely notice of appeal from the termination order.
Analysis
I. Respondent-Mother's Appeal
Respondent-mother challenges the trial court's conclusion that grounds existed to terminate her parental rights based on (1) neglect; (2) failure to make reasonable progress to correct the conditions that led to the children's removal from her care; and (3) dependency. N.C. Gen.Stat. § 7B-1111(a)(1)-(2), (6) (2013).
A termination of parental rights proceeding is comprised of two phases: adjudication and disposition. In re D.R.F.,204 N.C.App. 138, 141, 693 S.E.2d 235, 238, disc. review denied,364 N.C. 616, 705 S.E.2d 358 (2010). In the adjudication phase, the trial court must determine whether the petitioner has proven by clear, cogent, and convincing evidence that a ground for termination enumerated in N.C. Gen.Stat. § 7B-1111 exists. In re Young,346 N.C. 244, 247, 485 S.E.2d 612, 614 (1997). If the trial court determines that a statutory ground for termination exists, the court proceeds to disposition where it considers whether the termination of parental rights is in the best interests of the children. N.C. Gen.Stat. § 7B-1110(a) (2013).
On appeal, we review the trial court's finding of a statutory ground for termination to determine whether the court's findings of fact are supported by competent evidence and whether its findings, in turn, support its conclusions of law. In re Gleisner,141 N.C.App. 475, 480, 539 S.E.2d 362, 365 (2000). The trial court's decision as to whether termination of parental rights is in the children's best interests is reviewed for abuse of discretion. In re Anderson,151 N.C.App. 94, 98, 564 S.E.2d 599, 602 (2002). Any uncontested findings are deemed to be supported by the evidence and are binding on appeal. In re H.S.F.,182 N.C.App. 739, 742, 645 S.E.2d 383, 384 (2007). Furthermore, a valid adjudication by the trial court as to any single ground for termination is sufficient to sustain a termination order. In re P.L.P.,173 N.C.App. 1, 8, 618 S.E.2d 241, 246 (2005), aff'd per curiam,360 N.C. 360, 625 S.E.2d 779 (2006). "Thus, on appeal, if we determine that any one of the statutory grounds enumerated in § 7B-1111(a) is supported by findings of fact based on competent evidence, we need not address the remaining grounds." In re N.T.U.,--- N.C.App. ----, ----, 760 S.E.2d 49, 57, disc. review denied,--- N.C. ----, 763 S.E.2d 517 (2014).
As its first ground for termination, the trial court found that Respondent-mother had neglected the children under N.C. Gen.Stat. § 7B-1111(a)(1). A neglected juvenile is one who "does not receive proper care, supervision, or discipline ... or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare...." N.C. Gen.Stat. § 7B-101(15) (2013). In order to support an adjudication under N.C. Gen.Stat. § 7B-1111(a)(1), "[n]eglect must exist at the time of the termination hearing, or if the parent has been separated from the child for an extended period of time, the petitioner must show that the parent has neglected the child in the past and that the parent is likely to neglect the child in the future." In re C.W.,182 N.C.App. 214, 220, 641 S.E.2d 725, 729 (2007). The determination that a child is neglected is a conclusion of law reviewed de novo. In re Helms,127 N.C.App. 505, 510, 491 S.E.2d 672, 675-76 (1997).
After recounting the facts that led to the children's prior adjudication of neglect in July 2013, the trial court made detailed findings about Respondent-mother's subsequent failure and refusal to address the issues of mental illness, substance abuse, and domestic violence that led to the adjudication. The court further found that Respondent-mother's untreated mental health issues and borderline intellectual functioning "would pose a danger to the children if they were returned to her care" and "would prevent her from meeting the needs of her children .... and impair her ability to appropriately care for, protect, and supervise her children." Moreover, despite having shown "the ability to go get a job and report to work, attend scheduled appointments, and to make plans and implement those plans," the court found that Respondent-mother "has not maintained stable employment," "established stable living arrangements," or paid a reasonable portion of the children's cost of care. Based on these and other findings, the court concluded that Respondent-mother "has neglected the children" and "there is a reasonable likelihood of neglect if [the children] were returned to the mother."
The trial court also concluded that Respondent-mother "has actively neglected [the children] by failing to visit or communicate with them and thereby denied them her love and affection" based on the following:
The Mother has been inconsistent in her visitation with the children and failed to provide them with her love and affection for significant periods of time. [She] has not visited the children since December 10, 2013. On May 29, 2014, the Court suspended visits with the Mother until she successfully engaged in mental health treatment as recommended by her psychological evaluation. The Mother had opportunities to visit with the children since December 10, 2013, and has either indicated that she did not want to see her children or was unwilling to engage in the mental health treatment established as a requirement for obtaining visitation. The Mother has not sent letters or cards or made other attempts at communication with the children since December 10, 2013. The Mother's failure to visit her children was willful.
Respondent-mother faults the trial court for suspending her visitation and, therefore, "takes strong exception to the court's finding that the lack of visitation [thereafter] was evidence of neglect on her part." However, because an adjudication under N.C. Gen.Stat. § 7B-1111(a)(1) requires only a showing "that the parent has neglected the child in the past and that the parent is likely to neglect the child in the future," we deem the court's additional finding of "active[ ] neglect[ ]" by Respondent-mother based on her lack of visitation with the children to be superfluous. C.W.,182 N.C.App. at 220, 641 S.E.2d at 729 ; see In re T.M.,180 N.C.App. 539, 547, 638 S.E.2d 236, 240 (2006) ("[E]rroneous findings unnecessary to the determination do not constitute reversible error" where adjudication of neglect is supported by sufficient additional findings.).
Respondent-mother does not contest the evidentiary findings summarized above but argues that "the trial court failed to take into account changes in circumstances that tended to make it unlikelythat prior incidents of ... neglect would be repeated." She notes that she was no longer (1) in a relationship with those persons who had committed domestic violence against her; or (2) in contact with the men who had sexually abused her children. Respondent-mother also faults DSS and the trial court for failing to allow her to place the children with Ms. J.P. or Ms. B., thereby "removing what little support system she had and helping to make a bad situation much worse."
We conclude that Respondent-mother's persistent failure to address the issues of mental health, substance abuse, and domestic violence that led to the prior adjudication of neglect combined with the marked deterioration in her personal circumstances that has occurred as a result of these unresolved issues support the trial court's determination that Respondent-mother's rights were subject to termination based on a finding of neglect pursuant to N.C. Gen.Stat. § 7B-1111(a)(1). See In re B.S.O.,--- N.C.App. ----, ----, 760 S.E.2d 59, 67-68 (2014) (affirming trial court's adjudication of neglect as basis for termination where respondent failed to address her mental health issues that led to children's removal from her custody); In re S.D.J.,192 N.C.App. 478, 485-87, 665 S.E.2d 818, 823-24 (2008) (concluding that statutory ground of neglect was supported by evidence that respondent had failed to make any significant progress on her case plan to address her mental health issues); In re E.T.S.,175 N.C.App. 32, 39-40, 623 S.E.2d 300, 304 (2005) (affirming termination based on neglect where respondent "did not follow through with mental health counseling," attempted suicide, failed to complete parenting classes, and did not cooperate with social workers).
Respondent-mother's argument is therefore overruled. Because the trial court properly concluded that grounds existed to terminate her rights pursuant to N.C. Gen.Stat. § 7B-1111(a)(1), we need not review the remaining grounds for termination under N.C. Gen.Stat. § 7B-1111(a)(2) and (6). P.L.P.,173 N.C.App. at 8, 618 S.E.2d at 246.
II. Respondent-Father's Appeal
Respondent-father does not challenge the trial court's adjudication of grounds to terminate his parental rights for neglect, failure to make reasonable progress, and willful abandonment of the children. N.C. Gen.Stat. § 7B-1111(a)(1)-(2), (7). Instead, he claims that the trial court erred at the disposition phase by refusing to hear testimony from Ms. B. and Ms. J.P. about their willingness to serve as placements for Respondents' children. Respondent-father takes exception to the court's ruling that this evidence was irrelevant to its assessment of the children's best interests under N.C. Gen.Stat. § 7B-1110(a). He contends that the court's refusal to consider this evidence was prejudicial to him, Respondent-mother, and the children. We disagree.
"Once a trial court has concluded during the adjudication phase that grounds exist for termination of parental rights, it must decide in the disposition phase whether termination is in the best interests of the child." D.R.F.,204 N.C.App. at 141, 693 S.E .2d at 238. Given the specific question before the court under N.C. Gen.Stat. § 7B-1110(a), we have held that "[a] trial court may, but is not required to,consider the availability of a relative placement during the dispositional phase of a hearing to terminate parental rights." In re M.M.,200 N.C.App. 248, 258, 684 S.E.2d 463, 469 (2009) (emphasis added), disc. review denied,364 N.C. 241, 698 S.E.2d 401 (2010).
The hearing transcript reflects that Ms. J.P. testified during the adjudication phase, describing Respondent-mother's "mental health" and "behaviors" toward her children during "the past few years[.]" Although DSS alleged dependency as a ground for terminating Respondent-mother's rights, neither Respondent-mother nor Respondent-father asked Ms. J.P. about her ability to serve as "an appropriate alternative child care arrangement" for the children even though such testimony would have been relevant to determining whether grounds for termination existed under N.C. Gen.Stat. § 7B-1111(a)(6). SeeN.C. Gen.Stat. § 7B-1111(a)(6) (stating that trial court may terminate parent's rights if parent is incapable of providing care for child and"lacks an appropriate alternative child care arrangement").
When Ms. J.P. returned to the witness stand during the disposition phase, the trial court sustained DSS's objection to questions about her ability to "provide a safe home for the children." The court also refused to allow Ms. B. to describe "the progress she has made since the last time she was in front of [the court]" regarding her suitability as a placement option for her grandsons. When asked by the trial court how such evidence was relevant to the issue of "whether or not it's in ... these children's best interests that the parental rights of [Respondent-father] be terminated," counsel for Respondent-father cited "family member relationships and possible placements for [the children] that doesn't include terminating parental rights, and going past that, towards adoption [by non]-family members." The court disagreed, stating that such testimony would not "be relevant to [its] findings." At the conclusion of the hearing, the court emphasized its belief "that it's in [the children's] best interests [to] have a clean break so that they can develop healthy attitudes, identities, and go on with their lives, in spite of the chaos, and ... dysfunction of those relatives around them."
We note that the termination order includes the following findings reflecting the court's consideration of the dispositional factors set forth in N.C. Gen.Stat. § 7B-1110(a) :
72. The permanent plan for the children is adoption. It is necessary in order to effectuate the permanent plan that the parental rights of their parents be terminated.
73. The children's ages are as follows:
a. [Andre]: 9 years old
b. [Nehemiah]: 5 years old
c. [Jared]: 6 years old
d. [Janice]: 3 years old
e. [Chantel]: 8 years old
74. The bond between the children and Mother has been weakened by the length of time that the children have been in foster care without daily contact with the Mother and by the Mother's failure to visit. While the two older children have some bond with the Mother, it is not a strong one.
75. There is no bond between the children and [Respondent-father].
....
77. There are no substantial barriers or challenges for the children to find adoptive homes and to be adopted. Adoption is likely for all the children.
78. The four youngest children are in homes where the families have indicated that they plan on adopting the children. These children are well-bonded to their foster parents.
79. [Andre] is not in an adoptive home, but the Durham DSS has registered him with NC Kids to locate an adoptive home. [Andre] and his foster parent have bonded.... [Andre] is under ten years of age, has the ability to bond with a family, and is very adoptable.
(Emphasis added.) As Respondent-father does not contest these findings, they are binding on appeal. H.S.F.,182 N.C.App. at 742, 645 S.E.2d at 384.
In light of the absence of a bond between Respondent-father and the children coupled with his acknowledged abandonment of them, we cannot conclude that the trial court abused its discretion by viewing the suitability of Ms. B. and Ms. J.P. as placement options as irrelevant to the question of whether terminating Respondent-father's parental rights was in the children's best interests. See M.M.,200 N.C.App. at 258, 684 S.E.2d at 470 (determining that trial court did not abuse its discretion in terminating respondent's rights where respondent's mother was willing to take custody of child but respondent himself had "never seen [child] and has never inquired after [child's] well-being"); see also In re J.A.A.,175 N.C.App. 66, 75, 623 S.E.2d 45, 51 (2005) (explaining that "[t]he decision to terminate parental rights is vested within the sound discretion of the trial judge and will not be overturned on appeal absent a showing that the judge's actions were manifestly unsupported by reason").
Conclusion
For the reasons stated above, we affirm the trial court's 27 October 2014 order terminating Respondents' parental rights.
AFFIRMED.
Chief Judge McGEE and Judge STEPHENS concur.
Report per Rule 30(e).
Opinion
Appeal by respondents from order entered 27 October 2014 by Judge William A. Marsh, III in Durham County District Court. Heard in the Court of Appeals 26 May 2015.

Pseudonyms are used throughout this opinion to protect the privacy of the children and for ease of reading. N.C.R.App. P. 3.1(b).

The trial court also terminated the parental rights of Chantel's biological father ("D.B."), but he is not a party to this appeal. Janice's putative biological father ("J.G.") is likewise not a party to the appeal.

Section 7B-906 was replaced by N.C. Gen.Stat. § 7B-906.1 (2013).

Respondent-mother formally withdrew her "Motion to Modify Custody" on 4 November 2013.