IN RE: Z.A.D.K. T.J.P.K.
No. COA09-1266.
Court of Appeals of North Carolina.
Filed: March 16, 2010.
This case not for publication
Kathleen Arundell Widelski, for Petitioner-Appellee Mecklenburg County Department of Social Services, Youth and Family Services.
Janet K. Ledbetter, for Respondent-Appellant.
BEASLEY, Judge.
Respondent appeals the order terminating her parental rights to the minor children, Z.A.D.K. and T.J.P.K.[1]
Mecklenburg County Department of Social Services, Youth and Family Services (YFS) became involved with this family on 30 May 2007 after Respondent was severally beaten by her boyfriend. Respondent's boyfriend was charged with attempted murder, three counts of violation of domestic violence protective orders, communicating threats, and breaking and entering. The children were placed with their maternal grandparents due to the threats made on Respondent's life by her boyfriend. On 15 June 2007, YFS held a Team Decision Meeting with Respondent and the maternal grandparents were present. Respondent admitted that there was domestic violence in her relationship with her boyfriend, and that she had a history of involvement with men who were violent towards her. At the meeting, the maternal grandparents also indicated that they were no longer able to provide care for the children. On 18 June 2007, YFS filed juvenile petitions alleging the children were neglected and dependent juveniles.
On 11 September 2007, pursuant to a mediated agreement, the children were adjudicated neglected and dependent juveniles. Respondent was ordered to comply with a mediated case plan and submit to a parenting capacity evaluation (PCE). A review hearing was held on 23 October 2007. At the hearing, Respondent was ordered to meet with the PCE evaluators and the juveniles' therapist in order to understand the results of evaluations and better methods to engage in services in light of her learning style and level of understanding. The trial court further ordered that before reunification could occur, Respondent must have an understanding of the children's emotional needs and ways best to meet them.
On 15 February 2008, a psychological evaluation and the PCE report were completed by Dr. Russell C. Hancock. The next review hearing was held on 18 February 2008. The trial court adopted a concurrent plan of adoption.
The trial court held a permanency planning hearing on 19 May 2008. At that time, the treatment team believed that Respondent did not exercise the skills learned by service providers.
A subsequent permanency planning hearing was held on 25 September 2008. Respondent had completed her parenting classes, domestic violence treatment, and her PCE. Respondent also reported that she was living in a hotel with a new boyfriend. The trial court found that it was not possible for the children to return home immediately or within six months. The trial court further found that while Respondent had participated in services, she had not been able to demonstrate the skills learned from service providers and she had not adequately remedied the issues that led to placement of the children in care. The permanent plan was changed to adoption as the trial court found that further reasonable efforts to reunify with Respondent would be futile or inconsistent with the children's need for a safe and permanent home within a reasonable period of time. YFS was to continue to make efforts with Respondent.
On 25 November 2008, YFS filed petitions to terminate Respondent's parental rights. Termination proceedings were held on 24 February, 14 April and 19 May 2009. The trial court found grounds existed to terminate Respondent's parental rights pursuant to N.C. Gen. Stat. §§ 7B-1111(a)(1) (neglect) and (a)(6) (dependency), and entered an order terminating her parental rights on 9 July 2009. Respondent appeals.
The trial court may terminate parental rights upon finding
That the parent is incapable of providing for the proper care and supervision of the juvenile, such that the juvenile is a dependent juvenile within the meaning of G.S. 7B-101, and that there is a reasonable probability that such incapability will continue for the foreseeable future. Incapability under this subdivision may be the result of substance abuse, mental retardation, mental illness, organic brain syndrome, or any other cause or condition that renders the parent unable or unavailable to parent the juvenile and the parent lacks an appropriate alternative child care arrangement.
N.C. Gen. Stat. § 7B-1111(a)(6) (2009).
A dependent juvenile is defined as "[a] juvenile in need of assistance or placement because the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or whose parent, guardian, or custodian is unable to provide for the care or supervision and lacks an appropriate alternative child care arrangement." N.C. Gen. Stat. § 7B-101(9) (2009). "In determining whether a juvenile is dependent, `the trial court must address both (1) the parent's ability to provide care or supervision, and (2) the availability to the parent of alternative child care arrangements.'" In re B.M., 183 N.C. App. 84, 90, 643 S.E.2d 644, 648 (2007) (quoting In re P.M., 169 N.C. App. 423, 427, 610 S.E.2d 403, 406 (2005)).
Respondent argues that the trial court committed reversible error in concluding grounds existed to terminate her rights under N.C. Gen. Stat. § 7B-1111(a)(6). Respondent contends there is no evidence that she has an incapability where there is a reasonable probability that such incapability will continue for the foreseeable future and prevent her from providing proper care and supervision for Z.A.D.K. and T.J.P.K.
In this case, the trial court made the following pertinent findings of fact:
23. That during the November 2007 individual session, Ms. Nesbit realized that "[Respondent] was able to talk about the domestic violence materials that were presented and use appropriate [domestic violence] terms. However, [Respondent] did not appear to be applying this knowledge to her relationships." During the individual session, Ms. Nesbit and [Respondent] discussed [Respondent's] need to address her emotional stability, lack of problem solving skills, making healthy choices, and behaviors. Ms. Nesbit recommended continued participation in individual therapy. They developed a list of issues and goals that the [R]espondent . . . should address with her therapist at the Behavioral Health Center.
. . . .
32. That [Respondent's] last individual therapy session, prior to the termination proceedings, was on September 4, 2008. By October 2008, [Respondent] had completely ceased attending individual therapy or contacting Ms. Wallace. At that time, the [R]espondent . . . had not made sufficient progress on the therapeutic goals. Ms. Wallace still had concerns about [Respondent's] ability to apply "learned" skills, such as domestic violence and parenting, in her life. Furthermore, Ms. Wallace had concerns about [Respondent's] relationship choices and problem solving skills. Additionally, Ms. Wallace believed that the [R]espondent . . . needed additional work on taking responsibility for her actions. At that time, the [R]espondent . . . had not achieved any of her therapeutic goals such that she could be successfully discharged from individual therapy. There is no evidence that after October 2008, [Respondent] received or completed individual therapy sessions with a different provider.
. . . .
34. That the [R]espondent . . . is unable to provide appropriate care for the juveniles.
. . . .
39. That Ms. Neal was able to observe the [R]espondent . . . and the juveniles during the in-home sessions. Ms. Neal, as a result of her observations, surmised that [Respondent] was unable to effectively parent [Z.A.D.K.] and [T.J.P.K.]. Ms. Neal had some concerns about [Respondent's] ability to utilize learned parenting techniques and/or basic knowledge of parenting such as redirection and discipline. The [R]espondent. . . was not able to distribute affection and attention equally among [Z.A.D.K.] and [T.J.P.K.]. During the in-home sessions, [Respondent] spent a majority of her time holding [Z.A.D.K.] even though [Z.A.D.K.] could walk. [Respondent] appeared to overly nuture [Z.A.D.K.] while giving [T.J.P.K.] limited attention. [T.J.P.K.] displayed behavioral problems such as disobedience and temper tantrums, during the in-home parenting sessions. [Respondent] was unable to control [T.J.P.K.'s] behaviors. The [R]espondent [] had to be consistently prompted, coached, and shown how to interact with [T.J.P.K.] and utilize parenting techniques. Based on the information obtained during the classroom and in-home sessions, Ms. Neal found that [Respondent] seemed limited in her ability to redirect the juveniles and her ability to apply basic parenting techniques at the appropriate times. Although [Respondent] completed the parenting education program on February 14, 2008, she was not able to implement the skills covered in the parenting program.
40. That [Respondent] was given an opportunity to participate in weekly one hour supervised visits with the juveniles. Ms. Tina Nichols began supervising the [family's] visits in July 2007. At the time of the termination hearing, Ms. Nichols was continuing to supervise the [family's] visits. Ms. Nichols supervised a total of 81 visits between July 2007 and February 2009. [Respondent] attended all but 2 of the scheduled visits.
41. That Ms. Nichols and Ms. Neal shared the same concerns regarding the [Respondent's] inability to appropriately care for the juveniles. For example, Ms. Nichols recommended [Respondent] hold [T.J.P.K.'s] hand to prevent [him] from running away. There were times when the juveniles would become aggressive with each other and the [R]espondent . . . . [T.J.P.K.] and [Z.A.D.K.] would hit and bite each other including [Respondent]. During the visits, the juveniles would fight, pull each other's hair, or throw toys. There was a time when the [R]espondent . . . was unaware that [T.J.P.K.] ran away.
42. That according to Ms. Nichols' observations, beginning in July 2007, [Respondent] was not able to control and/or manage the juveniles or demonstrate an ability to apply basic parenting techniques. [Respondent] would not take any independent action to redirect the juveniles' behaviors. Ms. Nichols observed that [Respondent] appeared fearful of the juveniles' behaviors until prompted by the social worker assistant to address the behaviors. Sometimes, [Respondent] would not respond when the juveniles bit or hit her. At times, she would remind the juveniles that they were not supposed to hit her. After being reminded, the juveniles would or would not comply with the [Respondent's] statement.
43. That since July 2007 continuing to April 2009, there has been no change in [Respondent's] ability to control and/or manage the juveniles or demonstrate appropriate parenting techniques. At every visit, Ms. Nichols would offer suggestions to [Respondent] to assist her in managing and/or controlling the juveniles. [Respondent] was only able to utilize the specific suggestions during the visit in which the suggestion was given. [Respondent] has to be continually reminded of appropriate parenting techniques. [Respondent's] reminders regarding the use of appropriate parenting techniques would sometimes occur in the same visitation session. During future scheduled visits, Ms. Nichols would have to remind [Respondent] of the same parenting techniques. As a result of her inability to demonstrate basic parenting skills, it was impossible for her to redirect and/or discipline the juvenile.
44. That the supervised visits were altered to allow [Respondent] to have one on one visitation with each juvenile due to her failure to adequately split her attention and manage the juveniles. After [Z.A.D.K.] and [T.J.P.K.'s] visits were changed, the visits improved somewhat. During the separated visits, [Respondent] was never able to demonstrate control over the juveniles.
. . . .
47. That [Respondent] was ordered to complete a Parenting Capacity Evaluation (hereinafter referred to as "P.C.E."). The P.C.E. is tailored to make specific recommendations regarding an identified parent and child. The P.C.E. was assigned to Dr. Russell Hancock who was qualified as an expert in forensic psychology. [Respondent] participated in and completed the P.C.E. Afterwards, Dr. Hancock, pursuant to a court order, completed and then submitted the P.C.E. to the Court on or about February 11, 2008.
48. That the suggested diagnoses for the [R]espondent . . . were as follows: Axis I diagnoses included V61.21 Neglect of Child; 995.81 Physical Abuse of Adult (victim); Adjustment Disorder with Depressed Mood; and Marijuana Dependence (Early Partial Remission); Axis II diagnoses were Antisocial and Borderline traits and Borderline Intellectual Functioning; Axis III diagnoses as Obesity and Asthma; and Axis IV diagnoses were problems with the legal system, Primary Support, Economics, Occupation, and Social System.
49. That according to Dr. Hancock's results, there is a possibility that [Respondent] could attain a mastery of the skills necessary to appropriately parent the juveniles. However, the [R]espondent . . . would have a hard time learning these skills due to the abovementioned diagnoses. Dr. Hancock did not find any cognitive limitations in [Respondent] that would interfere with her ability to participate in the identified service programs; obtain and/or maintain safe, appropriate, and permanent environment for the juveniles; or obtain and/or maintain her ability to have sufficient income to meet the juveniles' needs. Yet, Dr. Hancock expressed concern about the respondent mother's ability to provide an environment where the juveniles could psychologically or physically mature.
50. That Dr. Hancock based on review of records, test results, observations, contact with collaterals, and interview with [Respondent], found that the [R]espondent . .. did not have a significant or consistent support system. During her sessions with Dr. Hancock, [Respondent] liked to focus on her own victimization. [Respondent] did not accept responsibility for her choices which led to the juveniles' out of home placement. Instead, [Respondent] blamed others such as her parents and [her boyfriend] as the reasons for the juveniles' removal. Dr. Hancock could not definitively determine if this inability to accept was due to personality traits, other brain function(s), or a combination of the two.
. . . .
55. That [Respondent] had some employment while the juveniles were in the Petitioner's custody. [Respondent] reported several part-time jobs to the social worker. These part-time jobs did not last for an extended period of time. She testified that beginning on or about April 2008, she was employed at Waffle House . . . earn[ing] $5.50 per hour plus tips. In March 2009, [Respondent] obtained part-time employment at the Dollar Tree. . . . She works 10-15 hours every 2 weeks and earns $7.25 per hour. This income is insufficient to meet the [Respondent's] needs as well as the juveniles' needs.
. . . .
58. That the [R]espondent . . . was never able to demonstrate an ability to obtain and maintain safe, stable, and appropriate housing. There are concerns about the availability of resources needed to maintain her current housing.
. . . .
62. That the [R]espondent . . . received services to address these issues for 2 years. Unfortunately, nothing changed. She is not in position now or in the foreseeable future to appropriately meet the juvenile's needs or to appropriately provide care for the juvenile. Hence there is great risk of harm to the juveniles if they are returned to [Respondent's] custody, care, or control. Moreover, [Respondent] experienced difficulty in addressing her own needs. Hence, she would face difficulty in meeting the juveniles' needs. It is not likely that [Respondent] will be able to independently parent the juveniles on a 24 hour basis.
. . . .
67. That the [R]espondent . . . has not offered any alternative placements for the juveniles. When Ms. Waters broached this subject with the [R]espondent . . ., she was resistant.
Respondent challenges the trial court's findings of fact, arguing that they are not supported by clear and convincing evidence. Respondent further argues that the findings are insufficient to support the following conclusion:
13. That pursuant to N.C.G.S. §7B-1111(a)(6), the [R]espondent . . . is incapable of providing for the proper care and supervision of the juveniles such that the juveniles are dependent juveniles within the meaning of NCGS §7B-101 and that there is a reasonable probability that such incapability will continue for the foreseeable future. With the [Respondent's] participation in the offered services, she still was not able to demonstrate an ability to parent the juveniles or meet their needs. She has not offered an alternative placement for the juveniles. There is a reasonable probability that this incapability will continue for the foreseeable future.
We review the trial court's order to determine "whether the trial court's findings of fact are based on clear, cogent, and convincing evidence and whether those findings support the trial court's conclusion that grounds for termination exist pursuant to N.C. Gen. Stat. § 7B-1111." In re C.W., J.W., 182 N.C. App. 214, 219, 641 S.E.2d 725, 729 (2007). Findings of fact supported by competent evidence are binding on appeal, even where there is evidence which supports contrary findings. In re Mills, 152 N.C. App. 1, 6, 567 S.E.2d 166, 169 (2002).
In this case, despite two years of receiving services, Respondent could not implement healthy parenting skills. Chimere Neal, Respondent's parent educator, testified that Respondent completed her nurturing program parenting classes, but Respondent was not able to demonstrate what she learned in the parenting classes. Lisa Warmack-Nesbit, who works with victims of domestic violence, offered similar testimony. Ms. Nesbit testified that Respondent "takes in the information but is not necessarily able to apply it to her life in the situation at that time." Respondent's counselor, Monica Wallace, testified that Respondent had not completed her therapy goals, because she had not continued with her therapy sessions. Ms. Wallace also noted that Respondent was receptive to suggestions; however, she questioned whether Respondent could apply what she had learned at the Women's Commission because Respondent continued to make poor relationship decisions. Social worker assistant, Tina Nichols, supervised Respondent's visits with the children beginning in July 2007. Ms. Nichols testified that Respondent was affectionate with the children but had a difficult time controlling them. Ms. Nichols expressed concern with Respondent's ability to control the children, noting times when the children had run out into the street unsupervised. The visits were changed to one-on-one with each child so Respondent could better manage. Even with one-on-one visits, Respondent had to be given reminders about appropriate responses to the child and discipline. Ms. Nichols testified that she would not recommend unsupervised visits between Respondent and the children. Ms. Nichols said she would be concerned about Respondent's "ability to manage the children's behavior, especially with their aggressive behaviors." She further noted that there had been too many times that Respondent was unaware that the children "ran off from her."
Dr. Russell Hancock conducted Respondent's PCE. He found no cognitive limitations to Respondent's ability to learn and apply the information she was given; however, he noted a failure to take responsibility and motivational limitations. Dr. Hancock noted that Respondent claimed to understand the impact of the domestic violence on the children, but there were a number of incidents that indicate otherwise. Dr. Hancock testified that his litmus test to determine if Respondent is able to meet the educational, safety, developmental needs, and basic needs such as clothing, housing and shelter of the children is whether the "individual exhibited that they can do that for themselves." Dr. Hancock testified that in his opinion, Respondent has been "unable to do that for herself so it's going to be difficult for her to do that for two additional people, i.e., her children, given the fact that she's not been able to establish that type of foundation for herself."
We conclude that the above recited evidence constituted clear, cogent, and convincing evidence to support the trial court's findings of fact. We further conclude that the findings support the trial court's conclusion that Respondent is incapable of providing for the proper care and supervision of the juveniles, that the juveniles are dependent within the meaning of N.C. Gen. Stat. § 7B-101, and that there is a reasonable probability that such incapability will continue for the foreseeable future and that Respondent has failed to provide an alternative placement for the children. Accordingly, we hold the trial court properly concluded grounds existed to terminate Respondent's parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(6). Having concluded that one ground for termination of parental rights exists, we need not address the additional grounds found by the trial court. In re Brim, 139 N.C. App. 733, 743, 535 S.E.2d 367, 373 (2000).
Once the trial court has determined that a ground for termination exists, the court conducts the disposition stage, where it must determine whether termination is in the best interest of the child. N.C. Gen. Stat. § 7B-1110(a)(2009). The trial court is required to consider the following:
(1) The age of the juvenile.
(2) The likelihood of adoption of the juvenile.
(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
(4) The bond between the juvenile and the parent.
(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
(6) Any relevant consideration.
N.C. Gen. Stat. § 7B-1110(a). The trial court's decision to terminate parental rights is reviewed for abuse of discretion. In re Shermer, 156 N.C. App. 281, 285, 576 S.E.2d 403, 407 (2003). "A trial court may be reversed for abuse of discretion only upon a showing that its actions are `manifestly unsupported by reason.'" Davis v. Davis, 360 N.C. 518, 523, 631 S.E.2d 114, 118 (2006) (quoting Clark v. Clark, 301 N.C. 123, 129, 271 S.E.2d 58, 63 (1980)).
Respondent argues that the trial court did not fully comply with the mandates of N.C. Gen. Stat. §§ 7B-1110(a)(2), (3), and (5).
Here, the trial court found:
1. That [Z.A.D.K.] was born [in] . . . 2006, in Mecklenburg County, North Carolina. [T.J.P.K.] was born [in] . . . 2005, in Mecklenburg County, North Carolina. Both juveniles currently reside in Mecklenburg County, North Carolina.
. . . .
66. That the juveniles have been placed in the same foster home since July 27, 2007. The juveniles are doing well in this home. Their needs are being met in this home. The social worker does not have any concerns regarding the care they are receiving in this home. Although this is not a potential adoptive placement for the juveniles, the social worker does not, at this time, have concerns about the juveniles' adoptability.
. . . .
70. That the goal of the case is adoption. The juveniles need a safe, stable, appropriate, and permanent environment. Finding a safe, stable, and permanent environment can only be accomplished through adoption. The only barrier to adoption is termination of parental rights. Termination of parental rights would assist in the adoption process.
. . . .
72. That the [R]espondent . . . requested continued visits with the juveniles.
We conclude that the trial court considered the factors in N.C. Gen. Stat. § 7B-1110(a) and made appropriate findings of fact. Moreover, given that Respondent received services for two years, never incorporating the parenting and domestic violence information provided, we are unable to conclude that the trial court abused its discretion in terminating respondent mother's parental rights. The trial court's order is affirmed.
Affirmed.
Judges WYNN and HUNTER, JR. concur.
Report per Rule 30(e).
NOTES
[1] Initials are used to protect the identity of the juveniles.