An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1277
NORTH CAROLINA COURT OF APPEALS

Filed: 15 April 2014

IN THE MATTER OF:

H.R., A.G, C.Z.G., and C.G.          Randolph County
                                     Nos. 11 JT 92-95


Appeal by respondent-mother from order entered 22 August 2013 by Judge Jayrene R. Maness in Randolph County District Court. Heard in the Court of Appeals 31 March 2014.

> *J. Tristan Routh for movant-appellee Randolph County Department of Social Services.*
>
> *Donna Taylor for guardian ad litem.*
>
> *Mercedes O. Chut for respondent-appellant mother.*

HUNTER, JR., Robert N., Judge.

Respondent-mother appeals from the district court's order terminating her parental rights as to juveniles H.R. ("Henry"), A.G. ("Aron"), C.Z.G. ("Zeke"), and C.G. ("Carl").[1] Because petitioner's evidence and the court's findings of fact are

---

[1] The parties stipulated to the use of these pseudonyms to protect the juveniles' privacy.

sufficient to establish grounds for termination based on neglect under N.C. Gen. Stat. § 7B-1111(a)(1) (2013), we affirm.

## I. Background

Henry was born in February 1998; Aron was born in November 2001; Zeke was born in October 2004; and Carl was born in September 2006. Carl and Zeke have the same father ("Mr. G"). Aron and Henry were fathered by two other men. The juveniles resided with respondent prior to the institution of these proceedings.[2]

On 3 and 5 May 2011, the Randolph County Department of Social Services ("DSS") filed petitions alleging the juveniles were neglected and dependent. The petitions specifically averred that the juveniles had excessive absences from school or daycare, and that respondent failed to provide them with proper supervision, had a history of substance abuse and violent domestic relationships, used inappropriate discipline, and exposed the juveniles to domestic violence in the home. The petitions further charged respondent with violating the provisions of two safety plans instituted by DSS by (1) allowing Henry to distribute medication to his younger siblings and (2)

---

[2] Henry was voluntarily placed outside respondent's home in 2007, after Aron disclosed that Henry had sexually abused him. Henry returned to respondent's home in 2008-09.

allowing respondent's boyfriend ("Mr. C"), who had an extensive history of domestic violence, to have contact with the juveniles. Finally, the petitions alleged that neither respondent nor the juveniles' fathers had identified an appropriate alternative child care arrangement. DSS obtained non-secure custody of all the juveniles on 4 and 5 May 2011.

The district court made adjudications of neglect and dependency as to each juvenile on 22 February 2012. In addition to the issues raised by the petitions, the court made the following findings related to Henry's sexual abuse of his siblings:

> In 2007, [Aron] alleged that [Henry] had sexually abused him. [Respondent] had [Henry] evaluated and he was placed out of the home. In 2008-2009, [Henry] returned to the home. Subsequent to his return, the minor children reported that [Henry] was sexually touching them again. [Respondent] indicated that she was unaware of any incidents. The only safety measure in place was that [Henry] was provided a separate bedroom. No other safety measures were put in place.

We upheld the adjudications on appeal. *In re H.R., A.G., C.Z.G., and C.G.*, __ N.C. App. __, 735 S.E.2d 452, 2012 WL 5864525 (2012) (unpublished).

In a permanency planning order entered 25 July 2012, the district court relieved DSS of any obligation to continue efforts to reunify the juveniles with their fathers and established a permanent plan of reunification with respondent. The court ceased reunification efforts with respect to respondent on 1 November 2012, and changed the permanent plan to adoption. On 14 December 2012, as amended 14 February 2013, DSS filed motions to terminate respondent's parental rights based on neglect, lack of reasonable progress in correcting the conditions that led to the juveniles' removal from her home, failure to pay a reasonable portion of the juveniles' cost of care, and dependency under N.C. Gen. Stat. § 7B-1111(a)(1), (2), (3), and (6) (2013).

At the termination hearing, the district court heard testimony from, among others, respondent; DSS caseworkers Tasha Hall and Darnell Myrick; Laura Stockwell, director of the Randolph County Family Crisis Center; and clinical psychologist Dr. Christopher Schaeffer, who performed a psychological evaluation of respondent in March 2012. The court found grounds to terminate respondent's parental rights based on neglect, failure to make reasonable progress, and dependency under N.C. Gen. Stat. § 7B-1111(a)(1), (2), and (6). It also concluded

that termination of parental rights was in the juveniles' best interests. Respondent filed timely notice of appeal from the termination order.

## II. Respondent's Appeal

Respondent challenges the grounds for termination found by the district court, claiming that they are unsupported by the court's findings of fact or by the evidence. She also contests many of the court's individual adjudicatory findings as unsupported by the evidence.

## A. Standard of Review

In reviewing an adjudication under N.C. Gen. Stat. § 7B-1109(e) (2013), this Court must determine whether the district court's findings of fact are supported by clear, cogent and convincing evidence, and whether the findings, in turn, support the court's conclusions of law. *In re Gleisner*, 141 N.C. App. 475, 480, 539 S.E.2d 362, 365 (2000). "If there is competent evidence, the findings of the trial court are binding on appeal[,]" *In re McCabe*, 157 N.C. App. 673, 679, 580 S.E.2d 69, 73 (2003), "even where some evidence supports contrary findings." *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). We are likewise bound by any unchallenged findings of fact. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729,

731 (1991). Moreover, "erroneous findings unnecessary to the determination do not constitute reversible error" where the adjudication is supported by sufficient additional findings grounded in competent evidence. *In re T.M.*, 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006). We review the district court's conclusions of law *de novo*. *In re J.S.L.*, 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006).

### B. <u>Adjudication under N.C. Gen. Stat. § 7B-1111(a)</u>

Our Juvenile Code defines a neglected juvenile as one who, *inter alia*, "does not receive proper care, supervision, or discipline . . . ; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare." N.C. Gen. Stat. § 7B-101(15) (2013). In order to support an adjudication under N.C. Gen. Stat. § 7B-1111(a)(1), "[n]eglect must exist at the time of the termination hearing." *In re C.W.*, 182 N.C. App. 214, 220, 641 S.E.2d 725, 729 (2007). Where the juveniles have been placed outside the home for a significant period of time, "a trial court may find that grounds for termination exist upon a showing of a history of neglect by the parent and the probability of a repetition of neglect." *In re L.O.K.*, 174 N.C. App. 426, 435, 621 S.E.2d 236, 242 (2005) (quotation marks and citation omitted). The determination that

a child is neglected is a conclusion of law. *In re Helms*, 127 N.C. App. at 510, 491 S.E.2d at 675-76.

The juveniles were adjudicated neglected on 22 February 2012, based on conditions arising under respondent's care. Therefore, in order to establish grounds for terminating respondent's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1), the evidence and the court's findings must demonstrate the probability of a repetition of neglect if the juveniles were returned to respondent. *In re L.O.K.*, 174 N.C. App. at 435, 621 S.E.2d at 242.

Initially, we note the district court expressly found that respondent "has neglected the minor children . . . and that such neglect is likely to repeat itself," as required by N.C. Gen. Stat. § 7B-1111(a)(1). In support of this determination, the court found, *inter alia*, that respondent had "[c]ontinued a relationship with a domestic violence abuser," Mr. C, and had failed to "maintain stable and appropriate housing[,] . . . grasp the concepts taught" in her domestic violence classes, or "complete her recommended mental health counseling until released by her therapist."

The court made detailed evidentiary findings concerning each of these issues. Specifically, findings 15mm-tt, 15zz,

15aaa-nnn, 15rrr-sss, 15uuu-bbbb, and 15eeee address respondent's continued involvement with Mr. C, despite repeated incidents of domestic violence, as well as her previous experience of domestic violence dating back to 2001 in her relationship with Mr. G. Findings 15eeee, 15llll, 27, 31, 34, 36, 43, and 46-47 depict the traumatic effects of the juveniles' exposure to domestic violence in respondent's care, the impact of which persisted at the time of the hearing.

Findings 15rr, 15nnnn-pppp, 15rrrr, and 48 describe respondent's housing instability and failure to obtain suitable housing for the juveniles despite having the financial means to do so. Portions of findings 15gggg, 15kkkk, 15nnnn-15pppp, and 15rrrr show that respondent made no changes to her residence to protect the younger children from further sexual abuse by Henry, despite being told of the need to do so.

Regarding her compliance with court-ordered remedial services, findings 15zz, 15eee-fff, 15iii, 15lll, 15www-zzz, and 15aaaa-bbbb reflect respondent's completion of two sessions of domestic violence classes and her failure to benefit therefrom, as evidenced by her persistent involvement with Mr. C and her refusal to acknowledge the attendant risks posed to her and her children. Finally, findings 15vv-yy detail respondent's failure

to complete individualized mental health counseling, as ordered by the court.

Having reviewed the court's findings in full, we conclude that they are more than adequate to demonstrate a probability of a repetition of neglect if the juveniles were returned to respondent's care. *See generally In re K.D.*, 178 N.C. App. 322, 329, 631 S.E.2d 150, 155 (2006) (affirming adjudication of neglect based on the respondent-mother's "struggles with parenting skills, domestic violence, and anger management, as well as her unstable housing situation"). Because respondent has not challenged the majority of the findings listed above, we deem them to be supported by competent evidence. *Koufman*, 330 N.C. at 97, 408 S.E.2d at 731. We will address her exceptions to the court's findings in Subsection C, *infra*.

Because we uphold the adjudication of neglect under N.C. Gen. Stat. § 7B-1111(a)(1), we need not address the additional grounds for termination found by the district court under N.C. Gen. Stat. 7B-1111(a)(2) and (6). *In re P.L.P.*, 173 N.C. App. 1, 9, 618 S.E.2d 241, 246 (2005), *aff'd per curiam*, 360 N.C. 360, 625 S.E.2d 779 (2006). Accordingly, we now turn to respondent's various objections to the court's fact-finding.

## C. <u>Findings of Fact</u>

### 1. <u>Domestic Violence by Mr. C</u>

Respondent first claims the district court's findings of fact "exaggerate the domestic violence between [her] and Mr. [C]." Specifically, she argues that the court overstated the number of domestic violence incidents between her and Mr. C and erroneously found that they had a physical altercation in November 2012.

Finding 15 includes the following subparts addressing this issue:

> mm. On April 14, 2011, Ms. Hall observed a very verbal altercation between [respondent] and Mr. [C]. On May 23, 2011, [respondent] and [Mr. C] had a physical altercation. On May 20, 2011, [respondent] went to the hospital in reference to injuries that Mr. [C] had caused.

> nn. On the night of June 1, 2011, [respondent] and Mr. [C] were involved in an altercation, and Mr. [C] hit [respondent] with a stool on her head and back. He took her cell phone and forced her to go to the store on June 2, 2011. Ms. Hall observed injuries from this incident when [respondent] had a visit with the minor child shortly thereafter. [Respondent] had a gash in her head that was approximately 1 inch to 1 ½ inches long.

oo. On August 22, 2011, [respondent] and Mr. [C] had a heated argument. She left the residence then subsequently resumed her relationship with him the next day.

pp. [Respondent] filed a 50B Domestic Violence Protective Order in Davidson County against Mr. [C] and Court was scheduled for June 22, 2011, but [respondent] subsequently dismissed the 50B. She did reside for a period of time at the Family Crisis Center but subsequently resumed her relationship with Mr. [C].

qq. On July 16, 2012, [respondent] contacted Ms. Hall about 10:30 p.m. . . . [and] reported that she and Mr. [C] had been in a physical altercation and that they had both been drinking. Mr. [C] wrapped his arm around her and hurt her, and she subsequently bit him during the altercation.

rr. . . . [F]rom May 20, 2011, until July 2012, [respondent] reported 13 changes in housing status. In June 2011, [respondent] was evicted from Section 8 housing and resided at the Family Crisis Center because of domestic violence between herself and Mr. [C].

. . . .

tt. Mr. [C] has two (2) convictions of assault on a female and also had a pending charge at the time of these incidents. [Respondent] was aware of Mr. [C]'s domestic violence history but continued her relationship with him despite having this information.

. . . .

zz. [Respondent] has completed two (2) sets of domestic violence classes. She took the first set of classes in 2011 through 2012, but during that time period, she was in a relationship with Mr. [C] and had repeated incidences of domestic violence and physical altercations during that time.

. . . .

ddd. [Respondent] reported to Ms. Stockwell that in June 2011, Mr. [C] and she had a verbal altercation. . . . Mr. [C] threw a stool and [respondent] was struck receiving injuries to her head and back. [Respondent] received medical treatment for these injuries. The Court allowed into evidence without objection . . . a collection of photos of injuries [respondent] suffered from this incident and which Ms. Stockwell personally observed while taking the photos. . . . [Respondent] reported to Ms. Stockwell that there were continuing verbal disputes, controlling behaviors by Mr. [C], and use of controlled substances during their relationship.

eee. [Respondent] completed domestic violence classes on November 28, 2011, and she completed a 2nd set of classes on January 8, 2013, but between the first and second sessions, she resumed her relationship with Mr. [C]. Due to continuing domestic violence incidents, Ms. Stockwell recommended that [respondent] participate in the 2nd round of domestic violence classes. [Respondent] and Mr. [C] had been in an off-and-on relationship while [she] took those classes.

. . . .

jjj. In late November 2012, [respondent] reported to Ms. Stockwell and Ms. Myrick that there was a physical confrontation involving shoving between her and Mr. [C]. The [p]olice were called and have been called on several occasions.

kkk. Following the domestic violence incident . . . in November 2012, [respondent] went to stay at the Family Crisis Center where she remained until early January 2013. Ms. Stockwell . . . recorded a telephone conversation between [respondent] and Mr. [C] in December 2012, while [respondent] was staying at the Crisis Center. . . . Mr. [C] made various threats to [respondent], stating that if she did not come back or if she left that he would destroy her belongings. [Respondent] indicated . . . she did not wish to continue the discussion with Mr. [C], but he insisted he would continue the discussion with her and that they would be together whether [respondent] liked it or not.

Insofar as these findings are unchallenged, we are bound thereby.

Much of respondent's argument stems from an implicit dispute about the meaning of the term "domestic violence." While respondent views the term as referring solely to physical conflict, DSS's witnesses and the court construed "domestic

violence" to include verbally abusive and aggressive or threatening behavior by Mr. C, in addition to physical assaults.

Stockwell testified that Mr. C's striking of respondent with the stool in June 2011 was "the only physical incident that I know of from [respondent] stating explicitly to me that this is what has occurred." Nonetheless, Stockwell averred that respondent described "several" additional domestic violence incidents with Mr. C, which were primarily "verbal disputes." In early 2012, for example, respondent and Mr. C had some sort of "confrontation [for] which the police were called on several occasions during that time." Likewise, Stockwell referred to "an incident of domestic violence that occurred in November of 2012 between [respondent] and Mr. [C]," but clarified that respondent did not report any physical violence during this incident.

Hall also testified that, of "the multiple incidents of domestic violence between [respondent] and Mr. [C], . . . two of these were violent, and violent enough that [respondent] ended up at the hospital." Though aware of just two physically violent episodes, on 20 May 2011 and 1 June 2011, Hall averred that respondent reported thirteen changes in her housing status between May 2011 and July 2012, and that "most of these

incidents were because of domestic violence between [her] and Mr. [C]."

Finally, the court's reference in finding 15zz to "repeated incidences of domestic violence *and physical altercations*" between respondent and Mr. C in 2011 and 2012 reflected that it construed the term "domestic violence" to include more than physical assaults. (Emphasis added). Insofar as respondent challenges the court's fact-finding based on her semantic disagreement with DSS and the court, we find no merit to her claim.

Contrary to respondent's assertion, finding 15rr does not attribute her loss of federally subsidized housing in June 2011 to domestic violence by Mr. C. Evidence supports the court's actual finding that respondent "was evicted from Section 8 housing" in June 2011 for failure to pay her utility bills.[3] We agree with respondent that the evidence does not support the finding in 15rr that, "[i]n June 2011, . . . [she] resided at the Family Crisis Center because of domestic violence between herself and Mr. [C]." Although Mr. C assaulted respondent with a kitchen stool on 1 June 2011, there is an indication that she

---

[3] The 22 February 2012 adjudication order includes a finding that respondent "was evicted from her housing due to her failure to comply with the guidelines of the section 8 housing program."

moved into the shelter to escape Mr. C prior in August 2011. However, we find this error to be harmless.

We also agree with respondent that the evidence does not support finding 15jjj's depiction of "a physical confrontation involving shoving between her and Mr. [C]" in November 2012. Concerning this incident, respondent testified that she and Mr. C "got in a fight and that led [her] to go to the women's shelter," but characterized it as an "argument" or "domestic dispute" rather than a physical conflict. Myrick testified that "[o]n or about November 25 of 2012, . . . [respondent] reported that she and Mr. [C] had a domestic dispute, and she left the home at that time and went to the women's shelter." Respondent told Myrick that she and Mr. C had "an argument and that she was attempting to leave the home and that he was causing problems and she did require the assistance of law enforcement at that time." Stockwell likewise attested to "an incident of domestic violence that occurred in November of 2012 between [respondent] and Mr. [C]," but was not aware of any physical assault. Respondent told Stockwell of "ongoing disputes [with Mr. C], that he was continuing to use substances and that she was fearful." Although she did not report any physical violence in

November 2012,[4] respondent told Stockwell that she moved into the emergency shelter to "get away from Mr. [C]" on 26 November 2012, and remained there until 10 January 2013.

In view of the overall history of domestic violence between respondent and Mr. C, including physical assaults occurring in May and June of 2011 and July of 2012, we conclude that the court's mistaken reference to a shoving episode in November 2012 was immaterial. In all other respects, respondent's challenge to the findings regarding her domestic violence history with Mr. C is without merit.

We further find no merit in respondent's objection to findings 15aaaa and 15bbbb, which state that "she has failed to grasp the concepts taught" in the domestic violence classes she completed in November 2011 and January 2013, "as evidenced by her continued relationship with a domestic violence abuser," Mr. C.[5] Respondent acknowledged that she continued her relationship

_____

[4] Respondent did tell Stockwell about an incident of "physical violence" between her and Mr. G in November 2010, which had occurred in front of the juveniles.

[5] Finding 15bbbb cited respondent's ongoing relationships with individuals who were abusive to her in prior relationships, including Mr. G, as evidence that her "domestic violence counseling . . . has not had an effect on her ability to grasp those concepts taught." The 22 February 2012 adjudication order includes findings that respondent "has a history of being

with Mr. C despite being advised that her children would be removed from her custody if she did so, and that she "indicated to DSS that [she] did not find him to be a threat to the minor children." Moreover, after completing her first series of domestic violence classes, respondent "went back to Mr. [C]." After the second series of classes, she continued to "have communication" with Mr. C and allowed him to come to her home, purportedly to remodel it.

Stockwell testified that Mr. C's phone call to respondent at the emergency shelter in January 2013 made it "apparent that he was continuing those controlling behaviors, the threatening behaviors, despite his participation in classes that should have taught him otherwise." Asked whether respondent had benefited from her domestic violence classes, Stockwell testified, "I don't believe she did show that she had actually put the information [from the domestic violence classes] to use." Stockwell told the court that there were many "things that make [Mr. C] very unpredictable and make [respondent] being around

---

involved with relationships that contain domestic violence," and that she and Mr. G had "an extensive history of engaging in incidents of domestic violence in the presence of the minor children." In March 2011, respondent told DSS of "[o]n again, off again" domestic violence involving Mr. G dating back to 2001.

him very unstable for her and potentially for children being in that environment."

Myrick testified that she had visited respondent's residence on the night of 23 January 2013, after respondent moved out of the shelter. At the front door, Myrick heard Mr. C and respondent discussing a television show. When Myrick "knocked on the door, it got quiet. [Respondent] came to the door . . . in her nightgown[.]" Myrick saw Mr. C's reflection in a mirror "going down the hallway." He was shirtless. When Myrick asked respondent about her claim that she and Mr. C were no longer together, respondent replied that "[h]e was helping her move her things in and to take his things out." In the bedroom, however, Myrick observed Mr. C's wallet on the dresser. Men's pants and folded clothing were underneath respondent's clothing on the dresser. "In the bathroom area, [Myrick] observed male aftershave, male shaving cream and a male razor, and three toothbrushes." When Myrick asked Mr. C about the situation, he stated that "it is what it is." Respondent then said, "I thought it would be okay since he was going to go to jail." Respondent later told Myrick that she visited Mr. C in prison on 2, 6, 13, and 20 April 2013. At the time of the

hearing, respondent did not know how long Mr. C would be incarcerated.

Respondent's own testimony showed that she continued to downplay the risk posed to her and her children by Mr. C. Recounting the June 2011 assault, respondent stated that "there was a stool thrown, and it bounced and it got me on the back of the head." Asked directly whether Mr. C had thrown the stool at her, she replied, "I guess, yeah." Respondent explained that she left Mr. C and moved into the crisis shelter in August 2011 because she "was tired of hearing his mouth," but that she "wasn't afraid" of him. She moved back in with Mr. C when she left the shelter. After giving birth to Mr. C's daughter in March 2012, respondent left him again in May. She testified that Mr. C had "started drinking again" and was yelling, "[b]ut no, he wasn't hitting [her]." She remained in contact with Mr. C and moved back in with him after a meeting with DSS. At the time of the termination hearing, respondent was working for Mr. C's sister at Days Inn, against the advice of Stockwell.

Where "different inference[s] may be drawn from the evidence, [the trial court] alone determines which inferences to draw and which to reject." *In re Hughes*, 74 N.C. App. 751, 759, 330 S.E.2d 213, 218 (1985). The inference drawn in findings

15aaaa and 15bbbb regarding respondent's failure to benefit from domestic violence courses is amply supported by the evidence. As discussed below, the court's findings are also consistent with the conclusions of respondent's psychological evaluation in March 2012.

## 2. <u>Respondent's Psychological Evaluation</u>

Respondent next challenges multiple findings regarding the testimony of Dr. Shaeffer, the clinical psychologist who evaluated her on 6 March 2012. Respondent asserts that the court mischaracterized Dr. Shaeffer's findings about her domestic violence history and his opinion of her amenability to treatment. She insists that his testimony and report are "far more equivocal than reflected in the court's findings." We disagree.

Dr. Shaeffer contrasted two types of individuals who remain in a domestic violence relationship. The first type consists of persons who "are unable to leave that relationship" for practical reasons, "but . . . their understanding of the negative effects of that relationship is such that they will at least try to minimize the negative impact on children." The second type "minimizes" or "denies the domestic violence" because they are "so highly invested in the relationship."

Although Dr. Shaeffer averred that both groups were "likely to repeat domestic violence relationships," he described the second group as in "a much worse position in terms of taking care of themselves and children" because they do not see "a need to protect the children from the domestic violence." Moreover, while any person involved in at least two violent relationships has a "greater than fifty percent" chance of having future relationships with domestic violence, individuals in the first group—who acknowledge the gravity of their situation—have "a much better prognosis" for improving their circumstances.

According to Dr. Shaeffer, respondent did not acknowledge the nature of the domestic violence between her and Mr. C "and the effects that it could have on her and her children." Respondent "said she does not view Mr. [C] as a threat to the children" despite "having been apprised of Mr. [C]'s criminal history, including domestic violence, and subsequent to taking out a protection plan and subsequently violating that protection plan and allowing [him] to have contact with the children." It appeared to Dr. Shaeffer "that [respondent] was putting her relationship with Mr. [C] as a priority above her protection and safety of her children."

Respondent further conveyed to Dr. Shaeffer "that she . . . did not perceive herself as having any particular problems that needed to be addressed." In the absence of such recognition and a concomitant desire for change, Dr. Shaeffer observed, "it's extremely unlikely that an individual is going to make any changes in their life because they don't see a need to, and even if it's imposed by others, it requires more effort than they are willing to sustain." "[F]rom a practical standpoint," Dr. Shaeffer opined, "therapy or counseling with individuals who don't have any sense of crisis or sense of a need to change something about themselves is . . . pretty much a waste of time." Based on his evaluation of respondent, he concluded that "a therapy/counseling relationship was unlikely to be helpful for her" at that time.

Respondent emphasizes Dr. Shaeffer's statement that he did not accept "as gospel" DSS's representations regarding domestic violence incidents. He went on to explain, however, that he "also had information from the emergency department and from [the prior adjudication] order and various other documentation that did not originate from [DSS]."

As summarized above, we find Dr. Shaeffer's hearing testimony to be ample competent evidence to support findings

15xxx, 15yyy, and 15zzz. Although respondent's brief to this Court also lists findings 15sss and 15uuu as objectionable renderings of Dr. Shaeffer's testimony, she offers no argument concerning them. Finding 15sss states that his evaluation of respondent "indicated a substantial history of domestic violence with not only Mr. [C] but previous partners, specifically Mr. [G]." It further states that Dr. Shaeffer noted, based on his interview with respondent and information provided by DSS, "that there had been numerous incidents of physical altercations between [respondent], Mr. [G], [respondent's] father, and various boyfriends, including Mr. [C]." These findings are supported by the hearing transcript. Dr. Shaeffer's testimony likewise supports finding 15uuu, which recounts additional information he received from DSS and respondent regarding her domestic violence history.

### 3. **<u>Respondent's Housing</u>**

Respondent next challenges several findings regarding her housing instability and lack of progress in obtaining stable, suitable housing for her children. We again find no merit in her claims.

Consistent with the court's findings, respondent concedes on appeal that her two-bedroom mobile home was unsuitable for

the juveniles and that she had made no improvements at the time of the hearing to accommodate them.  She contends, however, that she "testified about a plan to do so," and that "[h]er father . . . has priced the addition and has agreed to perform the work."  The court's findings 15nnnn, 15oooo, and 15pppp fully account for these representations, noting that respondent had "repeatedly testified of her father's intention to assist her physically and monetarily in doing that work" but had adduced no evidence "that they have done anything to make [respondent's] housing adequate for the minor children" as of 17 July 2012.  Indeed, respondent acknowledged during her testimony that the juveniles were removed from her custody in May 2011 and that, as of June 2013, she "still [did not] have appropriate housing for them . . . [o]r enough bedrooms for them."  Although her father had agreed to add on to her residence to accommodate the juveniles, she averred that "nothing has been started due to the fact that if we start all of this work on the trailer and . . . then the boys still don't come, then all of that is going to go to waste."  Therefore, insofar as respondent takes exception to findings 15nnnn–rrrr, her argument is overruled.

Respondent claims that finding 15rr erroneously states that she "reported thirteen different residences" to DSS.  The court

in fact found that she "reported 13 changes in housing status" during the period "from May 20, 2011, until July 2012." The finding is fully supported by Hall's testimony that, "from May 2011 to July of 2012, . . . [respondent] reported thirteen different changes to her housing status." When asked whether these changes in housing were "the result of the domestic violence incidents and arguments with Mr. [C]," Hall replied, "[p]robably twelve of them." Accordingly, respondent's assertion is groundless.

### 4. <u>Respondent's Progress Toward Reunification</u>

Respondent also contests multiple findings related to her progress in complying with her DSS case plan and the orders of the district court. Respondent lists numerous findings by number but appears to challenge the evidentiary support for only two of them. As for the other listed findings, she claims vaguely that they "minimized [her] substantial compliance with the court's directives." We decline to engage in an independent review of multiple paragraphs contained in the district court's fact-finding based merely on respondent's citation to them by number in her appellant's brief. Absent a particularized objection supported by argument, we deem the court's findings

supported by the evidence and binding on appeal. *See Koufman*, 330 N.C. at 97, 408 S.E.2d at 731.

The primary bases for respondent's objections appear in findings 15vv and 15xx:

> vv. In reference to individual counseling, [respondent] went to one (1) appointment at DayMark between June or July of 2011 and June 2012. [DSS] made a 2nd referral to Mental Health Services for [respondent] in August 2012. [Respondent] went to two (2) appointments for Mental Health in July 2012.
>
> . . . .
>
> xx. [DSS] recommended that [respondent] receive individual counseling in reference to co-dependency, anxiety and compulsive disorder. She was previously diagnosed with some of these conditions, but DayMark did not offer the individual counseling that had been recommended. Subsequently, [DSS] made a referral for counseling for [respondent] elsewhere so she could receive individual counseling. [Respondent] did not begin to comply with these services until the latter part of 2012 and has not been released from Mental Health Counseling as of today's date.

Respondent insists there was no evidence that she had any previous psychological diagnoses as stated in finding 15xx. Respondent casts the court's findings regarding her individualized mental health counseling as "inaccurate and misleading" as well as internally inconsistent. While she concedes that she "had not completed therapy as of trial," she

objects to the implication that she chose to discontinue her individual therapy in May 2011, instead claiming that she could not afford it.

With regard to the finding that respondent had been "previously diagnosed with some of these conditions," we note Hall's testimony that she and respondent's then-therapist at Carolina Counseling, Sue McKendry, referred respondent to DayMark for individualized counseling in May of 2011 "for codependency and issues regarding anxiety and obsessive/compulsive disorder." We find this testimony sufficient to support the contested portion of finding 15xx.

As for the timeline of respondent's mental health counseling, Hall testified that respondent attended just one session at DayMark in May of 2011 and offered no explanation for discontinuing this treatment. Respondent never told Hall that DayMark did not provide individual counseling, as she stated at the hearing. Nor did respondent notify Hall between June 2011 and June 2012 that she needed another referral or that she was not receiving the necessary mental health treatment. In her own testimony, respondent conceded that she received no mental health counseling between June 2011 and June 2012. Findings 15xx and 15vv are thus consistent with the hearing evidence.

Respondent also claims that "Hall's testimony contradicts the court's finding [in 15vv] that [she] had attended only limited [counseling] sessions in the summer of 2012." Hall testified that she referred respondent to the Center for Behavioral Health Services in June 2012, and that respondent attended "at least two to three appointments from the time she was referred in June" until Hall's departure from DSS on 17 August 2012. Inasmuch as Hall's testimony does not contradict the court's actual finding that respondent "went to two (2) appointments for Mental Health in July 2012," this assertion is without merit.

Finding 15vv may be at technical variance from the evidence insofar as the court found that DSS's second referral for mental health counseling occurred in August 2012 rather than June 2012. However, we find this discrepancy to be immaterial. The uncontested findings show that respondent obtained no mental health counseling for the year-long period between June 2011 and 2012, that she resumed counseling in July of 2012, and that she had not been released from treatment at the time of the hearing. We are likewise unmoved by respondent's objection to the court's characterization of July as "the latter part of 2012" in finding 15xx.

Respondent next objects to the court's failure to find that she completed parenting classes and cooperated with her service providers. She further faults the court for ignoring her positive employment record, regular visitation with the juveniles, and payment of child support.

As respondent observes, the termination order lacks a finding reflecting respondent's completion of parenting classes, as confirmed by Stockwell. The court did find that it had previously ordered respondent to "demonstrate skills learned from her parenting classes" and "[s]uccessfully complete individualized parenting instruction." Although the court did not explicitly order respondent to visit the juveniles, it did decree the scope and terms of her visitation. Therefore, at least in regard to assessing her reasonable progress under N.C. Gen. Stat. § 7B-1111(a)(2), we agree with respondent that the court's findings should have addressed the issues of parenting classes and visitation.[6]

"However, to obtain relief on appeal, an appellant must not only show error, but that . . . the error was material and

---

[6] The sole reference to parenting classes appears in finding 15gggg, which refers to respondent's "six (6) sessions of parent training" with Dr. Craig Smith to address Henry's sexual abuse upon his siblings.

prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action." *Starco, Inc. v. AMG Bonding and Ins. Servs.*, 124 N.C. App. 332, 335, 477 S.E.2d 211, 214 (1996); *cf. In re Estate of Mullins*, 182 N.C. App. 667, 670-71, 643 S.E.2d 599, 601 (2007) ("In a non-jury trial, where there are sufficient findings of fact based on competent evidence to support the trial court's conclusions of law, the judgment will not be disturbed because of other erroneous findings which do not affect the conclusions.") (quotation marks and citation omitted). We conclude that any omitted findings were not prejudicial. The district court did not base its adjudications under N.C. Gen. Stat. § 7B-1111(a) on respondent's failure to attend parenting classes or visitation, to cooperate with her service providers, or to pay child support. Moreover, none of these factors militates against the affirmative reasons for the adjudications, specifically the adjudication of neglect under N.C. Gen. Stat. § 7B-1111(a)(1). The court emphasized respondent's protracted refusal to extricate herself from a relationship with Mr. C, which was fraught with domestic violence, notwithstanding the clear risks posed to the juveniles and the significance of this refusal in light of respondent's history of violent relationships. The court further relied on

respondent's failure to make any progress toward obtaining housing that would be fit for the juveniles or would ensure that Henry's siblings could be protected from his sexual abuse. Because respondent has not shown prejudicial error, her argument is overruled.

## III. **Conclusion**

Respondent has failed to show any prejudicial error in the district court's findings of fact. Moreover, the court's findings are sufficient to support its adjudication of grounds to terminate respondent's parental rights for neglect under N.C. Gen. Stat. § 7B-1111(a)(1). The termination order is hereby affirmed.

Affirmed.

Judges ERVIN and DAVIS concur.

Report per Rule 30(e).