An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-1040

Filed 4 June 2025

Henderson County, No. 23JT000018-440

IN THE MATTER OF: K.J.B.L.

Appeal by respondent-mother from order entered 29 August 2024 by Judge Lora Baker in District Court, Henderson County. Heard in the Court of Appeals 22 April 2025.

> *Deputy County Attorney Sara Player for petitioner-appellee Henderson County Department of Social Services.*

> *Amanda Price for the guardian ad litem.*

> *Jason Senges for respondent-appellant mother.*

STROUD, Judge.

Mother appeals from the trial court's order terminating her parental rights on three grounds. Because the trial court's conclusion of law as to grounds for terminating parental rights under North Carolina General Statute Section 7B-1111(a)(2) was supported by the findings of fact, we affirm the trial court's order.

## I. Background

Kim,[1] born September 2018 in Henderson County, North Carolina, is the biological daughter of Mother. According to the trial court's unchallenged findings of fact, on 17 January 2023, Mother was incarcerated in Greenville, South Carolina, on "charges related to heroin possession, marijuana possession, and being a 'fugitive from justice.'" Mother reported that when she was arrested in South Carolina, "she was in a car with [Kim]'s father when they got pulled over and she was arrested because [the father] had a pill that turned out to be fentanyl." She also "said officers would not allow her to call any family members." Mother "executed a 'temporary guardianship agreement' on [26 January 2023] which named [Ms. P.] as a temporary guardian for" Kim. When she executed the agreement, "[M]other was aware that [Ms. P.] was a fentanyl user."

The trial court found that Kim came into Henderson County Department of Social Services' ("HCDSS") custody on 27 February 2023 after an initial petition was filed in South Carolina. The trial court found:

> 17. On Friday, [3 February 2023], a call was made to 911 stating that a minor child was in cardiac arrest at 21 Henry Street in Greenville, South Carolina. Prior to EMS arriving at the scene, the father left and took [Kim] to the hospital. The father handed over the limp and unresponsive juvenile to a Chaplin just inside the hospital doors. [Kim] was purple and cold to the touch.
>
> 18. [Kim] was resuscitated after multiple rounds of CPR and Narcan. [Kim] was then intubated and placed under sedation in the pediatric ICU as she was initially unable to

---

[1] Stipulated pseudonym used to protect the identity of the minor child. *See* N.C. R. App. P. 42.

breathe on her own. [Kim]'s urine drug screen was positive for fentanyl and there was blood observed in her rectum. Treating physicians had concerns of possible anal tearing. Doctors determined she overdosed on fentanyl and suffered a cardiac arrest. A rape kit was completed and STI tests were administered.

At the hospital in South Carolina, "[Ms. P.] reported that she and . . . [M]other are friends and that . . . [M]other has been 'in and out of trouble' and that she keeps [Kim] 'on and off.'" She also admitted that she "had used fentanyl as recently as a week ago. Fentanyl was also found on the property where [Kim] had been sleeping." The father reported that "he had not been actively involved with [Kim]" before Mother's incarceration in South Carolina and he was "unable to provide [Kim's] birthdate or an accurate spelling of her name." Ms. P. was arrested for unlawful neglect of a child. Because the father was not listed on Kim's birth certificate, law enforcement in South Carolina placed Kim into emergency protective custody.

South Carolina Department of Social Services ("SCDSS") filed a complaint seeking the removal of Kim on 3 February 2023, and a probable cause hearing was held in Greenville, South Carolina, on 6 February 2023. South Carolina Judge Katherine Tiffany determined all respondent parties to be residents of North Carolina and directed SCDSS to contact the proper North Carolina departments.

On 27 February 2023, HCDSS filed a Juvenile Petition, alleging Kim to be an abused juvenile. That same day, an order for nonsecure custody was entered, granting HCDSS nonsecure custody of Kim. When the petition was filed, [Ms. P] was

well-known to law enforcement in Western North Carolina due to her lengthy history of substance use and criminal activity. She had several pending charges in Henderson County for felony trafficking opium or heroin, felony possession with intent to manufacture, sell, or distribute schedule I and schedule II controlled substances, and others. As of the filing of the petition, [Ms. P.] remained in jail at the Greenville County Detention Center.

When Kim came into HCDSS custody, she had a "Child Medical Evaluation at the Believe Child Advocacy Center where a hair follicle sample was collected. [Kim] tested positive for methamphetamine, fentanyl, and norfentanyl. The sample contained 40 times the cutoff limit for fentanyl."

On 13 February 2023, Mother was extradited from South Carolina to Transylvania County, North Carolina, for outstanding felony probation violations. She was released from jail on 19 February 2023 and on 27 February 2023, Mother's supervised probation was revoked and she was sentenced to ninety days at "North Piedmont Confinement in Response to Violation ('CRV') center[,]" beginning on 10 March 2023. Mother was released on 28 May 2023 and decided to live in South Carolina.

On 1 June 2023, an adjudication hearing was held before Judge Kimberly Gasperson-Justice in District Court, Henderson County. Subsequently, in an adjudication order filed 3 July 2023, Kim was adjudicated as a neglected juvenile. In its disposition order filed that same day, the trial court ordered that custody of Kim would remain with HCDSS, finding no other "relative, guardian, custodian, or . . .

responsible adult" to whom custody could be granted. The trial court awarded Mother "[a] minimum of one (1) hour of supervised visitation[.]" Further, "[t]o achieve reunification," the trial court ordered Mother to "submit to random drug screens[,]" "complete parenting classes[,]" pay child support and ensure Kim's medical treatment needs are satisfied, and obtain and maintain stable housing and employment.

A permanency planning hearing was held on 12 October 2023, at which time Kim remained in the custody of HCDSS. The trial court found Mother had made little to no progress with her designated case plan for the purpose of reunification. Specifically, the trial court found Mother: had not taken part in parenting classes; did not complete required clinical assessments; was not providing "any financial support" for Kim; had not obtained stable housing; and had submitted no information to verify her employment.

The trial court determined the primary plan for Kim's custody to be reunification with her parents and the secondary plan to be adoption. However, a second permanency planning hearing was held on 29 February 2024, in which the trial court, again, found Mother had made no significant progress to show compliance with her case plan. The trial court determined the "primary plan to achieve a safe, permanent home" for Kim "should be adoption."

On 15 April 2024, HCDSS filed a motion for Termination of Parental Rights ("TPR") as to both Mother and Kim's biological father. The trial court held a hearing on this motion on 25 July 2024 and entered its order terminating the parental rights

of both parents on 29 August 2024. Mother timely filed notice of appeal to this Court on 18 September 2024. The father did not appeal.

## II. Termination of Parental Rights

On appeal, Mother argues that the trial court's findings of fact fail to support its conclusions of law on the grounds for termination. The trial court's order includes 182 findings of fact specifically regarding adjudication as to Mother,[2] and Mother challenges only four of these findings as being unsupported by the evidence. As to the grounds for termination, she argues only that the trial court's findings do not support its conclusions of law.

> When considering a petition to terminate parental rights, the trial court must first adjudicate the existence of the grounds for termination which have been alleged. At the adjudicatory stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence the existence of one or more grounds for termination under [North Carolina General Statute Section] 7B-1111(a) of the General Statutes. This Court reviews a trial court's adjudication of the existence of grounds to terminate parental rights in order to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. All findings of fact which are not challenged by a respondent are binding on appeal. The trial court's conclusions of law are reviewable de novo on appeal.

*In re G.B.*, 377 N.C. 106, 111, 856 S.E.2d 510, 514 (2021) (citations and quotation marks omitted).

---

[2] Forty-one of the 223 adjudicatory findings address only the father; the other findings address facts relevant to both Mother and the father or just Mother.

Mother challenges the trial court's three conclusions on separate grounds for terminating parental rights under North Carolina General Statute Section 7B-1111, Subsections (a)(1)-(3), respectively. *See* N.C. Gen. Stat. §§ 7B-1111(a)(1)-(3) (2023). "[A] finding by the trial court that *any* one of the grounds for termination enumerated in [North Carolina General Statute Section] 7B-1111(a) exists is sufficient to support a termination order." *In re B.O.A.*, 372 N.C. 372, 380, 831 S.E.2d 305, 311 (2019) (emphasis in original) (citations omitted).

## A. Failure to Make Reasonable Progress

Mother challenges the trial court's termination of her parental rights under North Carolina General Statute Section 7B-1111(a)(2), which states a trial court "may terminate . . . parental rights upon a finding" that

> [t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. No parental rights, however, shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty.

N.C. Gen. Stat. § 7B-1111(a)(2). In its order, the trial court concluded Mother "willfully left [Kim] in foster care or placement outside the home for more than twelve (12) months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of [Kim]."

On appeal, Mother argues the trial court's findings of fact do not support this conclusion of law. She specifically contends her failure to comply with her case plan does not support a conclusion that she had failed to make "reasonable progress" in correcting the conditions that led to Kim's removal. She argues "the case plan is not determinative as it is not tailored to . . . [M]other's conditions that led to [Kim]'s removal, specifically her incarceration and childcare arrangement." Thus, she argues the trial court failed to "analyze 'those conditions which led to the removal of [Kim]' as related to [M]other." Mother also contends the trial court erred in terminating her parental rights for failure to make reasonable progress because poverty was the main reason she could not make progress with her case plan. We disagree.

The trial court made detailed findings of the requirements of Mother's case plan and the following findings regarding the extent of her compliance with these requirements:

> 55. . . . [M]other has not completed a Comprehensive Clinical Assessment ("CCA").
>
> 56. . . . [M]other has not submitted to random drug screen requests from HCDSS.
>
> 57. . . . [M]other has not completed a parenting class.
>
> 58. She did not reasonably contribute to [Kim]'s cost of care.
>
> 59. . . . [M]other never provided verification of employment.
>
> 60. . . . [M]other never demonstrated that she obtained a safe and appropriate home.

61. She was not involved in [Kim]'s medical needs.

62. . . . [M]other did not consistently visit with [Kim].

63. While at the North Carolina CRV center from [12 March 2023] to [28 May 2023], . . . [M]other participated in a 12-step program, trauma treatment, employee training, moral recognition therapy, cognitive behavior therapy, [and] transition skills class.

64. After her release from the CRV center, . . . [M]other went to live in South Carolina.

65. On [1 June 2023], . . . [M]other told SW Sprouse she was living with an ex-boyfriend named Dequan and working with him at a Domino's Pizza in Greenville, South Carolina, but that she was not sure if she was going to stay there.

. . . .

71. The purpose of a CCA is to assess for mental health and substance use needs and then recommendations are made for treatment of those needs. The clinician must be able to make such a dual diagnosis to create a CCA.

. . . .

105. SW Sprouse conducted a home visit to 302 McGarity Street in Greenville, South Carolina on [16 February 2024].

106. The home did not meet minimum standards.

. . . .

119. On [15 May 2024], . . . [M]other told SW Sprouse that she had completed a CCA and that Tiffany Webb ("Ms. Webb") from The Phoenix Center was going to contact her.

. . . .

121. On [21 May 2024], SW Sprouse verified with Ms. Webb

that . . . [M]other completed an assessment on [13 May 2024]. . . . [M]other did not disclose her criminal history or CPS history with [Kim].

. . . .

122. Ms. Webb advised SW Sprouse that she was referring . . . [M]other for level 1 services, which includes 1.5 hours of substance abuse counseling 2-3 days each week, as well as individual counseling.

. . . .

140. During the [5 July 2024] meeting, . . . [M]other told SW Sprouse that she could not remember which week of parenting classes she was on. . . . [M]other provided no proof of her status and did not have her cell phone with her.

141. . . . [M]other told SW Sprouse during the [5 July 2024] meeting that she was unemployed. SW Sprouse asked . . . [M]other for verification of prior employment and . . . [M]other said she didn't have any.

142. SW Sprouse asked . . . [M]other for any kind of verification of owning 302 McGarity Street. . . . [M]other did not have anything to show.

. . . .

144. . . . [M]other was discharged as a client with The Pheonix Center on [9 July 2024] due to failure to engage in services after [13 May 2024].

. . . .

146. SW Sprouse has been unable to see . . . [M]other's reported improvements to the home at 302 McGarity Street. . . . [M]other has not tried to reschedule home visits after she cancels scheduled appointments.

147. . . . [M]other did not provide any photos or videos of any home improvements to SW Sprouse or the [c]ourt.

. . . .

149. [Kim] has received various medical treatments and therapies since coming into HCDSS custody, including speech, occupational, and play therapy. SW Sprouse informed . . . [M]other of appointments, but she did not ask about them. . . . [M]other is not aware of the names of [Kim]'s medical providers.

150. . . . [M]other also failed to visit [Kim] consistently.

. . . .

152. [Mother] had approximately 51 visitation opportunities with [Kim]. She missed 17 of those. She was late, sometimes as much as 40 minutes, to many of her visits.

. . . .

163. [Mother] provided a lot of different excuses about being late to visits or not attending at all, including that her car was broken down, her Uber was late, her ride was late, someone in her family was in the hospital, she was in a car wreck, she had a flat tire, or she ran out of gas on the way there.

. . . .

176. . . . [Mother] has repeatedly told SW Sprouse that she is on bed rest due to a high-risk pregnancy and that she cannot work due to this. However, . . . [M]other has not provided any proof of attending a doctor's appointment, let alone a doctor's note saying she cannot work.

### 1. *Conditions leading to Kim's removal*

Termination under North Carolina General Statute Section 7B-1111(a)(2) (2023):

> requires the trial court to perform a two-step

analysis where it must determine by clear, cogent, and convincing evidence whether (1) a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, and (2) the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child.

The willfulness of a parent's failure to make reasonable progress toward correcting the conditions that led to a child's removal from the family home is established when the parent had the ability to show reasonable progress, but was unwilling to make the effort.

*In re M.B.*, 382 N.C. 82, 88, 876 S.E.2d 260, 266 (2022) (citations and quotation marks omitted).

In *In re M.B.*, our Supreme Court determined that "the trial court was required to make a finding of willfulness to support its termination of [the] respondent's parental rights under [North Carolina General Statute Section] 7B-1111(a)(2)[.]" *Id.* at 88-89, 876 S.E.2d at 266. Our Supreme Court has also explained that

parental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to [North Carolina General Statute Section] 7B-1111(a)(2) even when there is no direct and immediate relationship between the conditions addressed in the case plan and the circumstances that led to the initial governmental intervention into the family's life, as long as the objectives sought to be achieved by the case plan provision in question address issues that contributed to causing the problematic circumstances that led to the juvenile's removal from the parental home.

For a respondent's noncompliance with a case plan to

> support termination of his or her parental rights, there must be a nexus between the components of the court-approved case plan with which the respondent failed to comply and the conditions which led to the child's removal from the parental home.

*In re A.J.P.*, 375 N.C. 516, 525-26, 849 S.E.2d 839, 848 (2020) (citations, quotation marks, and brackets omitted).

"Leaving a child in foster care is willful when a parent has the ability to show reasonable progress, but is unwilling to make the effort. The relevant time period for measuring reasonable progress under the circumstances begins after removal of the juvenile from the home." *In re C.W.*, 182 N.C. App. 214, 225-26, 641 S.E.2d 725, 733 (2007) (citations, quotation marks, and brackets omitted). Though "[a] parent's incarceration is a circumstance that the trial court must consider in determining . . . reasonable progress[,]" *id.* (citation and quotation marks omitted), it is not a dispositive factor that automatically tolls the twelve-month period. *See In re Shermer,* 156 N.C. App. 281, 290-91, 576 S.E.2d 403, 409-10 (2003) (though the respondent was incarcerated before the hearing, this Court reversed the termination order because "there was little involvement" he could maintain with the children due to his incarceration, and "[h]e had no involvement with the events that led to the children's removal").

In arguing that the trial court erred by relying on her lack of progress in her case plan as the reason for terminating her parental rights, Mother cites to our Supreme Court's opinion in *In re B.O.A.*, 372 N.C. 372, 831 S.E.2d 305 (2019). She

contends the Supreme Court emphasized that "a parent's case plan compliance is not identical to reasonable progress under [North Carolina General Statute Section] 7B-1111(a)(2)[ ]" and the trial court must consider the nexus between the case plan and the conditions which led to removal. Mother is correct, but the Supreme Court also explained the trial court has authority determine that a parent's very limited progress in correcting the conditions can support termination of parental rights if the case plan provisions address "directly or indirectly" issues that led to the removal:

> We do not, of course, wish to be understood as holding that a trial judge's authority to adopt a case plan pursuant to [North Carolina General Statute Section] 7B-904(d1)(3) is unlimited or that the reference to the "conditions of removal" contained in [North Carolina General Statute Section] 7B-1111(a)(2) has no meaning whatsoever. Instead, a trial judge should refrain from finding that a parent has failed to make reasonable progress in correcting those conditions which led to the removal of the juvenile simply because of his or her failure to fully satisfy all elements of the case plan goals. On the other hand, a trial court has ample authority to determine that a parent's extremely limited progress in correcting the conditions leading to removal adequately supports a determination that a parent's parental rights in a particular child are subject to termination pursuant to [North Carolina General Statute Section] 7B-1111(a)(2)[.] As a result, as long as a particular case plan provision addresses an issue that, directly or indirectly, contributed to causing the juvenile's removal from the parental home, the extent to which a parent has reasonably complied with that case plan provision is, at minimum, relevant to the determination of whether that parent's parental rights in his or her child are subject to termination for failure to make reasonable progress pursuant to [North Carolina General Statute Section] 7B-1111(a)(2).

> A careful review of the record satisfies us that the necessary nexus between the components of the court-approved case plan with which [the] respondent-mother failed to comply and the "conditions which led to [the juvenile's] removal" from the parental home exists in this case. Admittedly, the triggering event that led to [the juvenile]'s placement in DSS custody was an act of domestic violence and the discovery of an unexplained bruise located on [the juvenile]'s arm. However, a careful examination of the record clearly reflects that a much broader list of concerns contributed to causing the events that directly and immediately contributed to [the juvenile]'s adjudication as a neglected juvenile and her removal from the parental home.

*Id.* at 385-86, 831 S.E.2d at 314 (citations, quotation marks, brackets, ellipses, and footnote omitted).

Mother argues the conditions which led to Kim's removal were simply "her incarceration and childcare arrangement." If we view the circumstances of Kim's removal out of context, Mother is correct: the immediate problem when she was incarcerated in South Carolina in January 2023 was that she needed someone to care for Kim and her chosen "childcare arrangement," Ms. P. exposed Kim to fentanyl. But she was incarcerated because of her use and possession of illegal drugs and she chose Ms. P. to care for Kim, even though she knew Ms. P. was an active fentanyl user. As in *In re B.O.A.*, there was a "much broader list of concerns contribut[ing] to causing the events that directly and immediately contributed to [the juvenile]'s adjudication as a neglected juvenile and her removal from the parental home." *Id.* at 386, 831 S.E.2d at 314.

Mother overlooks the reasons for her incarceration in January 2023 and several other occasions and the dangers to which she had exposed Kim to by knowingly placing her with an active fentanyl user. The trial court correctly considered the entire context of the circumstances leading to Kim's removal. Mother also overlooks her documented history even before Kim was removed, as found by the trial court, related to her "use of alcohol and/or controlled or illegal substances," "mental health problems," "issues involving the knowledge of or ability to carry out appropriate acts of parenting," "issues involving [Kim]'s general care and supervision," and "issues involving the stability of day to day life[.]" Additionally, the neglect disposition revealed Kim was "the subject of numerous CPS reports in both Transylvania and Henderson counties[,]" including "three family assessments and one investigative assessment with concerns of improper supervision, injurious environment, improper care, improper medical/remedial care, and substance use[.]"

The holding in *In re B.O.A.* does not support Mother's claim her lack of case plan progress does not support a conclusion that she failed to remedy the conditions leading to Kim's removal because the case plan did not have a sufficient "nexus" with the reasons for Kim's removal. Much like our Supreme Court's analysis in *In re B.O.A.*, our review of the record before us reveals a "broader list of concerns[,]" which contributed to the conditions leading to Kim's removal, establishing the "necessary nexus" between Mother's case plan and the conditions leading to Kim's removal. *See id.*

- 16 -

In its termination order, the trial court found Mother had been incarcerated in South Carolina beginning 17 January 2023 "on charges related to heroin possession, marijuana possession, and for being a 'fugitive from justice.'" Kim was placed in the custody of social services after being taken to the hospital on 3 February 2023 for near-death cardiac arrest due to a fentanyl overdose. Though Mother was incarcerated when Kim was exposed to fentanyl, the trial court found she executed a "temporary guardianship agreement" with her friend, Ms. P., who was the primary caretaker of Kim when she was exposed to fentanyl.

On appeal, Mother argues Kim was removed due to circumstances created by Ms. P., which were completely outside of her control due to her incarceration. Although Mother did not have direct involvement in creating Kim's exposure to fentanyl, she knew Ms. P. was an active fentanyl user but she placed Kim in her care anyway. And Mother was not available to care for Kim even after she was released from incarceration in South Carolina because she was then incarcerated in North Carolina. The trial court found Mother "was extradited from South Carolina to Transylvania, North Carolina on [13 February 2023] due to multiple outstanding felony Class H/I probation violations." Mother was released on 19 February 2023, but her "supervised probation was revoked during criminal court on [27 February 2023]" and was sentenced to a CRV center. Mother was released from the CRV center on 28 May 2023 and chose to live in South Carolina.

Although Kim's overdose resulted from circumstances created by Ms. P.,

Mother was not without fault as she also has a criminal history of drug abuse and possession and she chose to grant temporary guardianship of Kim to a known drug user. Beyond the incident of Kim's overdose, the initial adjudication revealed long-standing and broader concerns as to Mother's overall ability to care for Kim and give her a stable environment. Mother was ordered to comply with a designated case plan to address and remedy these concerns for reunification.

The trial court considered changes in Mother's circumstances following Kim's prior adjudication, along with the lack of progress she made in her case plan. The trial court also found there were multiple meetings between Mother and her social worker, where the social worker provided information on completing her CCA, and requested she submit to various, random drug screens. Mother did not complete her CCA, nor did she submit to any of the random drug screening opportunities provided to her by the social worker before the termination hearing on 25 July 2024.[3] Regarding changes in circumstances, the trial court found Mother had been released from incarceration and the CRV center since Kim's initial adjudication, but decided to live in South Carolina while Kim remained in North Carolina. Mother does not challenge any of the trial court's findings and such findings "are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citations omitted).

---

[3] Mother did submit to a drug screen on 15 May 2024, but the trial court found "this drug screen was not random as . . . [M]other was aware of the appointment."

The trial court made additional unchallenged findings as to Mother's repeated failure to submit to random drug screens; obtain stable housing and employment; and complete her mental health assessments, substance abuse classes, and parenting programs. Similar to our Supreme Court's holding in *In re E.C.*, "[t]hese findings of fact establish the necessary 'nexus' between the components of [Mother]'s court-approved case plan with which she failed to comply and the conditions which led to [Kim]'s removal. 375 N.C. 581, 586, 849 S.E.2d 806, 810 (2020) (citation omitted).

We conclude Mother's brief incarceration and confinement does not prohibit a conclusion of willfulness. *See In re Yocum*, 158 N.C. App. 198, 204, 580 S.E.2d 399, 403 (2003) (holding a parent's incarceration "for a portion of the minor child's life[ ]" did not prevent him from maintaining engagement and providing support to the minor child). Though Mother was either incarcerated or in confinement for part of the twelve-month period, she still had ample opportunity to show some reasonable progress in correcting the conditions leading to Kim's removal, and this brief period of confinement did not prevent such reasonable progress. As found by the trial court, Mother made the active decision to move to South Carolina after her release from the CRV center and made no reasonable progress in her case plan following her release.

After careful review of the record before us, along with the unchallenged findings made by the trial court, we affirm the trial court's termination of Mother's parental rights under North Carolina General Statute Section 7B-1111(a)(2). Mother willfully left Kim in the placement of protective services for more than a year,

"without showing to the satisfaction of the [trial] court" that reasonable progress was made under her case plan to remedy the conditions leading to Kim's removal. Further, the "necessary nexus" between Mother's case plan and conditions leading to Kim's removal is established by findings of Mother's ability to adequately care and provide for Kim. The trial court's findings of fact support its conclusion of law as to Mother's willful failure to make progress to remedy the conditions leading to Kim's removal.

### 2. *Mother's poverty*

Under North Carolina General Statute Section 7B-1111(a)(2), parental rights may not be terminated by a trial court "for the sole reason that the parents are unable to care for the juvenile on account of their poverty." N.C. Gen. Stat. § 7B-1111(a)(2). Mother argues the trial court erred in terminating her parental rights because her poverty was the main reason she was unable to make progress on her case plan, and was the "sole barrier" to her being able to care for Kim. This argument is without merit.

> The poverty exception in [North Carolina General Statute Section] 7B-1111(a)(2) does not define the "elements" of this statutory ground for terminating parental rights. The exception instead establishes what is *not* a willful failure to make reasonable progress under the circumstances for purposes of [North Carolina General Statute Section] 7B-1111(a)(2). Therefore, to the extent [the] respondent-father "challenges the trial court's failure to make a required statutory finding" about poverty or its effect on his ability to care for the children, his argument is overruled.

> To the extent [the] respondent-father instead complains that the trial court's findings fail to reflect its consideration of the poverty exception in [North Carolina General Statute Section] 7B-1111(a)(2), we conclude his argument is without merit.
>
> Because the statutory poverty exception does not create an affirmative element or factor required to support an adjudication under [North Carolina General Statute Section] 7B-1111(a)(2), the trial court has no obligation to make specific findings on the issue in the absence of evidence tending to show that poverty is the sole reason for a parent's inability to care for the child.

*In re T.M.L.*, 377 N.C. 369, 382, 856 S.E.2d 785, 794-95 (2021) (emphasis in original).

Here, neither the evidence nor the trial court's unchallenged findings tend to show that poverty is the "sole reason" for Mother's inability to care for Kim. The trial court found that the social worker "encouraged [M]other to take advantage of housing opportunities in North Carolina[,]" including a recommendation that she "stay at a local homeless shelter in Henderson County, North Carolina for three (3) nights, which would move her up in priority on various housing assistance waiting lists." The social worker also talked to Mother about residing with her grandmother in Transylvania County, but Mother decided to stay in South Carolina. Mother moved "several times in 2023[,]" staying for a while in June 2023 with an "ex-boyfriend" and "working with him at a Domino's Pizza in Greenville, South Carolina," and then with another man, Brandon, in a one-bedroom apartment where he and his two daughters lived.

In August 2023, Mother told the social worker she had moved to a house with

three bedrooms in Greenville, South Carolina with Brandon, but "the landlord was not aware that someone had stolen all the copper piping from underneath the . . . home" so the "plumbing and HVAC would need to be redone." By September, she told the social worker that she was still living "at the same place with her boyfriend, his sister and her family, his mother, and his grandmother[ ]" and she and her boyfriend were "sleeping on the couch in the living room." She also told the social worker she was making $22.00 an hour "sitting with old people."

By October, Mother told the social worker she was going to buy the house she and her boyfriend were living in by paying "$1,900 in overdue taxes" on the property and "his family would sign over the house to her." The social worker advised her to use the $1,900.00 to "get her own place for herself and [Kim] that she knows will be approved." Mother did not take this advice, and in November told the social worker she had bought the house, although the "paperwork was not in her name yet" and she still "needed to 'get a couple things fixed' before HCDSS came to look at it." Two home visits were then scheduled, but one was cancelled due to heavy rain and flooding and Mother canceled the other. Ultimately, because Mother could never provide a stable address to be submitted for the Interstate Compact on the Placement of Children ("ICPC") home study, South Carolina denied Mother's request in January 2024.

In February 2024, the social worker visited the home and found that it had two bedrooms, not three, as Mother had reported. The social worker also found that the home "did not meet minimum standards" as it needed "a lot of repairs." It was heated

only by electric heaters, did not have a working stove, and electricity was provided to the house by extension cords from a "dilapidated shed outside." The social worker also asked for documentation that Mother owned the home, and she provided a tax bill in the name of "a Juanita Rice," who she identified as "the mother-in-law of one of her friends who resides in another state" and does not want the house.

Also, the 2023 property taxes had not been paid. In May 2024, Mother told the social worker that the home had been "completely remodeled" and scheduled a home visit for the social worker to see it. Mother then cancelled the visit, reporting to the social worker that she had "smashed her arm" moving a dresser in the child's bedroom and needed to go to the doctor. The social worker was never able to "see [M]other's reported improvements to the home" and Mother did not provide "any photos or videos" of the improvements to either the social worker or the court.

Throughout the trial court's findings regarding Mother's residence, the trial court also noted times Mother was working and when she was receiving assistance with her bills from her boyfriend or others. For example, the trial court found that Mother's "mother and other family help her pay her bills[ ]" and her "live-in boyfriend" had received settlement money from a car accident. The trial court also noted the social worker's recommendations for various resources to help Mother to find stable and suitable housing. Overall, based on the trial court's extensive findings, Mother had funds to obtain a residence suitable for Kim's needs, but she willfully made the decision to use her funds to pay back taxes on a house she did not own, and which she

knew was not suitable as a residence for Kim.

Poverty did not prevent Mother from taking advantage of many opportunities to submit to random drug screens at locations close to her residence to show compliance and progress with her case plan, but she never did. The trial court's detailed findings addressed Mother's financial hardships but made the ultimate determination these hardships did not prevent at least *some* reasonable progress to be made on her case plan. Poverty was not the "sole reason" Mother could not care for Kim, and Mother's argument is overruled. We therefore affirm the trial court's termination of her parental rights under North Carolina General Statute Section 7B-1111(a)(2).

The trial court also found two other grounds for termination of Mother's parental rights under North Carolina General Statute Section 7B-1111(a)(1) and (a)(3). But since the trial court's findings of fact and conclusions of law support termination based on North Carolina General Statute Section 7B-1111(a)(2), we need not address Mother's arguments regarding the other two grounds. *See In re C.I.M.*, 214 N.C. App. 342, 346, 715 S.E.2d 247, 250-51 (2011) ("We conclude that this evidence supports the trial court's findings, which, in turn, support its conclusion of termination of parental rights based on willful abandonment. Although [the] respondent-father challenges the other two grounds for terminating his parental rights found by the trial court, this Court has held that where the trial court finds multiple grounds on which to base a termination of parental rights, and an appellate

court determines there is at least one ground to support a conclusion that parental rights should be terminated, it is unnecessary for the appellate court to address the remaining grounds. We, therefore, do not address [the] respondent-father's arguments regarding these grounds for termination." (citations, quotation marks, and brackets omitted)).

## III.    Conclusion

Because the trial court's conclusion that Mother's parental rights should be terminated under North Carolina General Statute Section 7B-1111(a)(2) was supported by the findings of fact, we affirm the termination order.

AFFIRMED.

Judges TYSON and HAMPSON concur.

Report per Rule 30(e).